JOSHUA P. THOMPSON, No. 250955
Email: jthompson@pacificlegal.org
WILSON C. FREEMAN, Ariz. Bar. No. 036953*
Email: wfreeman@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JACK E. BROWN, Va. Bar No. 94680*
Email: jbrown@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747

*Attorneys for Plaintiff*
*\*pro hac vice pending*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JOHN D. HALTIGAN, <br><br>  Plaintiff, <br><br> v. <br><br> MICHAEL V. DRAKE, in his official capacity as President of the University of California; CYNTHIA K. LARIVE, in her official capacity as Chancellor of UC Santa Cruz; BENJAMIN C. STORM, in his official capacity as Chair of the UC Santa Cruz Psychology Department; and KATHARYNE MITCHELL, in her official capacity as Dean of the UC Santa Cruz Division of Social Sciences, <br><br>  Defendants. | No. 5:23-cv-2437 <br><br> **COMPLAINT** |

Complaint
No. 5:23-cv-2437                                            1

**INTRODUCTION**

1. The University of California (University or UC) has adopted a modern-day loyalty oath for professors who seek to join the faculty. Today's loyalty oath does not demand a pledge that professors are not members of the Communist Party, but professed agreement with "Diversity, Equity, and Inclusion" (DEI) policies and ideology. The DEI Statements demanded by the University are a thinly veiled attempt to ensure dogmatic conformity throughout the university system.

2. This requirement is imposed on every applicant to a faculty position in the University by means of a DEI Statement Requirement which applicants must clear in order to even get a foot in the door. The University administration ensures conformity and compliance by promulgating detailed rubrics and guidelines that tell applicants exactly what to say and what not to say in their Statements.

3. Dr. John D. Haltigan challenges this functional loyalty oath as a violation of his rights under the First Amendment. He has a PhD in Developmental Psychology and seeks to apply to a position at UC Santa Cruz, but the stringent ideological requirements of the DEI Statement make his application futile.

4. Dr. Haltigan is challenging the University of California's DEI Statement Requirement because what was true for the anti-communist loyalty oaths of the Cold War era is still true today: The First Amendment does not tolerate laws that cast a pall of orthodoxy over the classroom. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Academic freedom and freedom of expression demand that mandatory DEI Statements meet the same fate as the loyalty oaths of previous generations.

**JURISDICTION AND VENUE**

5. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction over this federal claim under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (redress for deprivation of civil rights). Declaratory relief is authorized by the Declaratory

Judgment Act, 28 U.S.C. § 2201.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and continue to occur in this district.

## PARTIES

7. Plaintiff John D. Haltigan is a U.S. citizen and resident of Pennsylvania. He has a PhD in Developmental Psychology from the University of Miami, and until earlier this year served as an Assistant Professor in the Department of Psychiatry at the University of Toronto. He is currently not employed in academia and is actively seeking employment in psychology departments around the country. He is qualified for the open position at UC Santa Cruz and has applied to that university in the past. He has also applied to similar positions around the country with less stringent DEI statement requirements.

8. Defendant Michael V. Drake is the President of the University of California and is sued in his official capacity.

9. Defendant Cynthia K. Larive is the Chancellor of UC Santa Cruz and is sued in her official capacity.

10. Defendant Benjamin C. Storm is a professor of psychology and the Chair of the UC Santa Cruz Psychology Department. He is sued in his official capacity.

11. Defendant Katharyne Mitchell is a professor of sociology and the Dean of the UC Santa Cruz Division of Social Sciences. She is sued in her official capacity.

## FACTUAL BACKGROUND

**The Evolution of the DEI Statement in the University of California**

12. The University of California has long considered diversity to be an important value in faculty hiring.

13. Accordingly, in 2005, the University of California published a new section of its Academic Personnel Manual (APM) encouraging "diversity and equal opportunity." This section was designed to ensure that faculty which put effort into

promoting equal opportunity and diversity receive some credit, but not to displace or substitute for scholarly rigor, objectivity, and originality.

14. Under the 2005 version of the APM, applicants were asked for DEI statements, but they were rarely decisive; DEI statements were weighed alongside more traditional measures of aptitude, including academic success, publications, research plans, and teaching ability.

15. Nor did the University provide prescriptive DEI statement guidelines and rubrics; the prevailing understanding of academic freedom prohibited the administration from dictating to faculty search committees about the beliefs of prospective academics.

16. Gradually, however, the University of California began to come under pressure to use DEI statements more aggressively to pursue ideological conformity and a vision of diversity focused on racial, ethnic, and gender balancing.

17. In 2015, the APM provision was revised, to add language that emphasized the importance of DEI achievement as compared to other traditional academic criteria.

18. In 2016, the California Budget Act allocated $2 million to promote racial and gender diversity, requiring a report from the University on fund usage and the racial/ethnic and gender composition of the University.

19. As a result, UC established the Advancing Faculty Diversity (AFD) program, which supports projects to increase racial and gender balance on UC campuses.

20. In November 2017, the UC Office of the President (UCOP) issued a detailed report on its use of the state funds.

21. The UCOP explained that the UC system was "particularly focused" on increasing diversity along racial and ethnic lines.

22. The UCOP Report highlighted a number of tools that particular departments or campuses could use to achieve the goal of enhanced racial and ethnic

Complaint
No. 5:23-cv-2437                              4

1 | balance, including DEI statements.

2 | 23. As explained in the UCOP Report, AFD had allocated the state's funds to pilot programs that aimed to advance faculty racial and ethnic balancing within the constraint of Prop 209.

24. Among these programs was $600,000 for a UC Riverside program in the College of Engineering, which involved a unique approach to diversity statements.

25. UCOP highlighted UC Riverside as particularly successful because it resulted in a ten-fold increase in underrepresented minority finalists and a doubling of female representation.

26. According to UCOP, UC Riverside's success derived from their use of a simple rubric measuring research and diversity statements and particularly from their evaluation of DEI statements from the beginning of the candidate evaluation process and as part of the initial candidate screening.

27. In the following years, AFD received more state funding and has continued to build on its program to pursue racial balancing and ideological conformity and apply the lessons from the original effort. In 2018−19, AFD launched a grant program supporting campus efforts to increase diversity. This grant program is ongoing.

28. AFD has since launched five recruitment projects aiming to increase racial balance, at a total cost of about $2.5 million, including a pilot program at UC Santa Cruz.

29. The AFD-funded pilot program at UC Santa Cruz focused on several elements. Most importantly, it emphasized that DEI statements should be an "important part" of the selection process, which must be considered in the first round of review. The program also encouraged search committees to engage in more in-depth discussions about the value of these statements.

30. However, some search committees at UC Santa Cruz disregarded the emphasis on screening based on DEI statements, fearing they might lose top

1  candidates.

2  31.  This led the University and the administration on the Santa Cruz
3  campus to refocus search committees on the importance of using DEI Statements
4  aggressively.

5  32.  Collectively, these initiatives and pressures have utterly transformed the
6  DEI Statement's purpose and use in the University of California system.

7  33.  Importantly, this transformation involved the widespread adoption of
8  the UC Riverside experiment to perform an initial screening of candidates based only
9  on the diversity statements (the Initial Screening Requirement).

10  34.  The other major change has been the widespread adoption of detailed
11  rubrics and guidelines to ensure uniformity.

12  35.  For example, around the same time that the California State legislature
13  was giving money to the University to adjust the racial and gender balance in its
14  faculty, the University's Academic Personnel and Programs Office (APP) issued more
15  detailed guidelines for evaluating DEI statements.

16  **DEI Statements as Ideological Litmus Tests at UC Santa Cruz**

17  36.  Following these developments, UC Santa Cruz now provides prospective
18  applicants with detailed guidelines on what to say and what not to say on their DEI
19  statements.

20  37.  On the main "Diversity" page for the UC Santa Cruz Office of Academic
21  Personnel (APO), UC Santa Cruz makes clear that the University's understanding of
22  diversity is about hiring and promoting individuals from specific racial and ethnic
23  groups.

24  38.  APO defines the terms "diversity," "equity," and "inclusion" in a specific
25  manner that ensures successful applicants adhere to a particular ideology and
26  worldview.

27  39.  APO goes on to explain that DEI statements are evaluated in three
28  categories: awareness, experience, and future plans at UC Santa Cruz.

40. Ideas and beliefs that applicants are supposed to convey are embedded throughout APO's expectations but particularly captured under the "awareness" heading.

41. Experience and future plans are evaluated based on an applicant's past or planned contributions to diversity, equity, and inclusion in teaching, research and professional work, and service and professional activities. The activities and contributions applicants are asked to discuss are thinly veiled proxies for particular beliefs that the administration favors.

42. The main diversity page also links to a "starting rubric," to further drive home to applicants exactly what they must say to pass through the DEI filter.

43. To receive a high score under the terms set by the rubric, an applicant must express agreement with specific socio-political ideas, including the view that treating individuals differently based on their race or sex is desirable.

44. The rubric evaluates DEI statements based on the three criteria mentioned above: awareness (or "knowledge," as the rubric describes it), experience, and future plans, with a scoring range of 1–5 for each. 1–2 represents a low score, 3 represents a mixed score, and 4–5 represents a high score.

45. For each criterion, high scores are reserved for those who promise to adhere to a specific world view that requires treating individuals differently according to race.

46. Under the rubric, low scores are specifically promised for applicants that believe race and sex should not be used to judge individuals.

47. Further orthodoxy for applicants to recite is provided on a list on APO's website of "common myths" about DEI in faculty recruitment and hiring under its "Academic Recruitment Resources" page.

48. In the common myths document, among other things, the University makes clear its commitment to race-centric hiring and its focus on silencing dissent on these issues.

49. This document sends a clear message to applicants: those who reject DEI orthodoxy will demonstrate a low "understanding" or "awareness" of DEI and will not be considered for a position at UC Santa Cruz.

50. Finally, UC Santa Cruz's Psychology Department has a page for Resources on Antiracism under the heading of "DEI Resources."

51. This page embraces without reservation numerous controversial political and ideological perspectives, including the ideas of controversial author Ibram Kendi, linking to and endorsing multiple speeches and works.

52. The documents on this page are not presented as academic research, or as the individual perspectives of particular professors, but as the official view of UC Santa Cruz's Psychology Department.

53. Individually and collectively, the guidelines, rubrics, and reference materials require applicants to repeatedly attest to particular beliefs to produce a passable DEI Statement.

54. The mandatory beliefs have nothing to do with the University's mission, the qualifications for any given tenure-track position, or professional standards for academics. They are about propagating the ephemeral political ideology of the Administration.

55. The combined result of this DEI Statement Requirement and the Initial Screening Requirement has created a situation where applicants who fail to demonstrate conformity with the beliefs and ideology represented on the APO website know that their application is futile.

56. This process has the intent and the effect of driving contrary ideas and viewpoints out of the marketplace of academic hiring.

### Dr. Haltigan's Qualifications

57. Dr. Haltigan obtained his PhD in Developmental Psychology from the University of Miami in 2009.

58. After obtaining his doctorate, Dr. Haltigan served as a postdoctoral

fellow first at the University of Illinois at Urbana-Champaign (until 2011), then at the University of North Carolina at Greensboro (until 2013), then at the University of Ottawa (until 2016).

59. From 2016 until earlier this year, Dr. Haltigan was an Assistant Professor in the Department of Psychiatry at the University of Toronto.

60. His research interests include the legacy of early caregiving experiences for child and adolescent development, brain and bodily systems that mediate the effects of early social experiences on development, and evolutionary development psychopathology, among others.

61. Dr. Haltigan has been a co-investigator on several research programs operating under federal and other grants, he has over 60 publications to his name, and several additional manuscripts under review.

62. He has over a decade of experience teaching and mentoring students from all backgrounds.

63. Dr. Haltigan is committed to colorblindness and viewpoint diversity. He objects to DEI orthodoxy and believes individuals should be considered based on individual merit.

64. He is currently actively seeking jobs in academia and has applied to positions at other universities with less stringent DEI requirements.

**UC Santa Cruz's Psychology Department's Job Opening**

65. On July 21, 2022, UC Santa Cruz posted an open hiring announcement for a tenure-track position in Developmental Psychology.

66. According to the hiring announcement, the Psychology Department requires a DEI statement in order to apply, and "urges" candidates to review the scoring rubric explained above.

67. It also makes clear that an initial screening of candidates will be performed using only the DEI statement and a research statement.

68. The DEI Statement requirement for this position makes Dr. Haltigan's

1  application futile. His stated views on "colorblind inclusivity," "viewpoint diversity,"
2  and "merit-based evaluation" alone, especially in the context of the Initial Screening
3  Requirement, make it impossible for him to truthfully compete for the position.

4      69.    If Dr. Haltigan were to apply for this position, he would be compelled to
5  alter his behavior and either remain silent about the many important social issues
6  addressed by the DEI Statement Requirement or recant his views to conform to the
7  dictates of the University administration.

## First Claim for Relief:

## Violation of the First Amendment of the United States Constitution

## Unconstitutional Conditions

11      70.    Plaintiff hereby realleges and incorporates by reference the allegations
12  contained in the previous paragraphs.

13      71.    Defendants are acting under the "color of state law" within the meaning
14  of 42 U.S.C. § 1983 in imposing and enforcing a DEI Statement Requirement on all
15  applicants for faculty positions.

16      72.    Defendants are denying a benefit to Plaintiff in a manner that infringes
17  his First Amendment rights.

18      73.    Defendants are requiring Dr. Haltigan to express ideas with which he
19  disagrees in order to be eligible for employment. This is an unconstitutional form of
20  compelled speech and is unconstitutional even when that requirement is tied to a
21  government benefit to which the speaker is not entitled.

22      74.    The DEI Statement Requirement forces applicants to UC Santa Cruz to
23  express agreement with the University's views on racism and social justice, and
24  ultimately seeks to regulate speech outside the contours of the program.

25      75.    The DEI Statement Requirement unconstitutionally leverages the
26  availability of a position at the University to force applicants to express agreement
27  with the University's ideology.

28      76.    The DEI Statement Requirement places anyone with Dr. Haltigan's

views who wants to work at the University of California in an untenable position. One can either file an honest, but doomed, application, or one can lie and recant his or her honest views. Silence and dissent are not options if he or she wants to progress past the initial screening.

77. Because the DEI Statement Requirement requires Dr. Haltigan to affirm particular beliefs that are inherently separate from the qualifications for the position or the purpose of the University as a whole, it imposes a condition on employment that would be unconstitutional if done outright.

## Second Claim for Relief:

## Violation of the First Amendment of the United States Constitution

## Viewpoint Discrimination

78. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous paragraphs.

79. Defendants are acting under the "color of state law" within the meaning of 42 U.S.C. § 1983 in imposing and enforcing a DEI Statement Requirement on all applicants for faculty positions.

80. The DEI Statement Requirement represents invidious viewpoint discrimination against any applicant holding views contrary to the detailed ideological standards set out in the DEI rubric and other guidance documents.

81. The purpose of the DEI Statement Requirement is to penalize certain viewpoints and drive those viewpoints from the marketplace of academic hiring.

82. Dr. Haltigan's views on colorblind inclusivity, viewpoint diversity, and merit-based promotion and hiring are all anathema to the University's express requirements in the DEI Statement.

83. The DEI Statement Requirement has no relationship to established professional standards, the University's mission, or the qualifications for the position in question.

84. Because the DEI Statement Requirement is not tailored to any

compelling interest, it is unconstitutional.

## Request for Relief

Plaintiff respectfully requests the following relief:

A. A declaration that the DEI Statement Requirement employed by the UC Santa Cruz Psychology Department violates the First Amendment to the United States Constitution;

B. A preliminary injunction forbidding UC Santa Cruz and Board of Regents officials from enforcing, or attempting to enforce, the DEI Statement Requirement against Dr. Haltigan;

C. A permanent injunction forbidding UC Santa Cruz and Board of Regents officials from enforcing, or attempting to enforce, the DEI Statement Requirement against Dr. Haltigan;

D. An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988;

E. Such other relief as this Court deems proper.

DATED: May 18, 2023.

Respectfully submitted,

JOSHUA P. THOMPSON
WILSON C. FREEMAN*
JACK E. BROWN*

By ___/s/ Joshua P. Thompson___
      JOSHUA P. THOMPSON

*Attorneys for Plaintiff*
*\*pro hac vice pending*