JOSHUA P. THOMPSON, No. 250955
Email: jthompson@pacificlegal.org
WILSON C. FREEMAN, Ariz. Bar. No. 036953*
Email: wfreeman@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JACK E. BROWN, Va. Bar No. 94680*
Email: jbrown@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747

*Attorneys for Plaintiff*
*pro hac vice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| JOHN D. HALTIGAN,<br><br>                                    Plaintiff,<br><br>        v.<br><br>MICHAEL V. DRAKE, in his official capacity as President of the University of California; CYNTHIA K. LARIVE, in her official capacity as Chancellor of UC Santa Cruz; BENJAMIN C. STORM, in his official capacity as Chair of the UC Santa Cruz Psychology Department; and KATHARYNE MITCHELL, in her official capacity as Dean of the UC Santa Cruz Division of Social Sciences,<br><br>                                    Defendants. | No. 5:23-cv-02437-EJD<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. Edward J. Davila<br><br>Date: October 12, 2023<br>Time: 9:00 a.m.<br>Courtroom: 4 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

LEGAL STANDARD .......................................................................................... 4

ARGUMENT ....................................................................................................... 5

   I.  Plaintiff has standing ................................................................................ 5

     A. Dr. Haltigan suffered a redressable injury at the time of filing because
        he was ready and able to apply ................................................................ 5

     B. Dr. Haltigan does not have to subject himself to unconstitutional
        compelled speech to challenge the policy ............................................... 9

     C. Dr. Haltigan is very likely to be subject to the DEI Statement Policy
        when he applies for a job in the future ................................................... 10

  II. Dr. Haltigan has adequately alleged a viewpoint discrimination claim ....... 10

     A. The Amended Complaint alleges sufficient facts to show that the DEI
        Statement policy is a political litmus test ............................................. 12

     B.  The First Amendment has long prohibited universities from
        conditioning teaching jobs on adopting the university's political
        ideology ................................................................................................ 13

     C.  Dr. Haltigan has adequately alleged that the DEI Statement policy
        will effectively bar his application ......................................................... 19

  III. *Pickering* balancing does not apply to Dr. Haltigan's unconstitutional
       conditions claim ...................................................................................... 21

CONCLUSION .................................................................................................. 23

CERTIFICATE OF SERVICE ........................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for International Development v. Alliance for Open Society International, Inc.,*
570 U.S. 205 (2013)...........................................................................21–23

*Arizona Right to Life Pol. Action Comm. v. Bayless,*
320 F.3d 1002 (9th Cir. 2003)...............................................................9–10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................4–5

*Baggett v. Bullitt,*
377 U.S. 360 (1964)..............................................................................11

*Bd. of Cnty. Comm'rs., Wahaunsee Cnty. v. Umbehr,*
518 U.S. 668 (1996)..............................................................................21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).............................................................5, 12, 19–20

*Bras v. California Pub. Utilities Comm'n,*
59 F.3d 869 (9th Cir. 1995)....................................................................7–8

*Carney v. Adams,*
141 S. Ct. 493 (2020)............................................................................6–7

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988)..............................................................................10

*Demers v. Austin,*
746 F.3d 402 (9th Cir. 2014)...............................................................16–18

*Dragovich v. U.S. Dep't of the Treasury,*
764 F. Supp. 2d 1178 (N.D. Cal. 2011).......................................................8

*F.C.C. v. League of Women Voters of California,*
468 U.S. 364 (1984)..............................................................................22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000).................................................................................4

*Garcetti v. Ceballos,*
547 U.S. 410 (2006)...........................................................................14–16

*Gratz v. Bollinger,*
539 U.S. 244 (2003)................................................................................6

*Grutter v. Bollinger,*
539 U.S. 306 (2003).........................................................................1, 11

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) .................................................................. 10

*International Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) .............................................................................. 20

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ................................................................. 1, 10−11, 18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 4

*Malarkey v. Texaco, Inc.*,
    983 F.2d 1204 (2d Cir. 1993) .................................................................. 19

*McCarthy v. United States*,
    850 F.2d 558 (9th Cir. 1988) ..................................................................... 4

*NEA v. Finley*,
    524 U.S. 569 (1998) ........................................................................... 18−19

*Northeastern Florida Chapter of Associated General Contractors of*
    *America v. City of Jacksonville*,
    508 U.S. 656 (1993) ............................................................................ 6, 8

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................................................................ 6

*Perry v. Sindermann*,
    408 U.S. 593 (1972) .............................................................................. 15

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*,
    391 U.S. 563 (1968) ......................................................................... passim

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of*
    *Health & Hum. Servs.*,
    946 F.3d 1100 (9th Cir. 2020) ............................................................... 7−9

*Porter v. Bd. of Trs. of N.C. State Univ.*,
    72 F.4th 573 (4th Cir. 2023) ................................................................... 18

*Santa Monica Food Not Bombs v. City of Santa Monica*,
    450 F.3d 1022 (9th Cir. 2006) ................................................................. 10

*Shackelford v. Deloitte & Touche, LLP*,
    190 F.3d 398 (5th Cir. 1999) .................................................................. 19

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ......................................................................... 15−16

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................................................. 12

*Students for Fair Admissions, Inc. v. President & Fellows of*
*Harvard Coll.,*
143 S. Ct. 2141 (2023) ................................................................. 11, 17, 21

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ............................................................................ 10

*Terry v. A.C. Cook,*
866 F.2d 373 (11th Cir. 1989) ............................................................ 20

*Wetherbe v. Smith,*
593 F. App'x 323 (5th Cir. 2014) ................................................... 16–17

*Wilbur v. Locke,*
423 F.3d 1101 (9th Cir. 2005),
*abrogated on other grounds by Levin v. Com. Energy, Inc.,*
560 U.S. 413 (2010) ............................................................................. 4

*Worrell v. Henry,*
219 F.3d 1197 (10th Cir. 2000) .......................................................... 17

**Other Authorities**

Cal. Const. art. I, § 31(a) .................................................................. 17

Fed. R. Civ. P. 8(a)(2) ...................................................................... 12

Fed. R. Civ. P. 12(b)(6) ...................................................................... 4

# **INTRODUCTION**

Plaintiff Dr. John D. Haltigan is in an active search for an academic job. A former assistant professor of psychology at the University of Toronto, Dr. Haltigan has over a decade of experience teaching, researching, and mentoring students of all backgrounds. First Amended Complaint ("FAC") ¶¶ 58−64. This spring, Dr. Haltigan learned about an opportunity at the University of California Santa Cruz (UC Santa Cruz) that fits his background and interests.

Unfortunately, UC Santa Cruz makes clear that, as a matter of policy, Dr. Haltigan cannot be considered for the position because of his views on politically salient issues totally unrelated to the job in question. The First Amendment does not tolerate laws that cast "a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). The University of California, however, uses a DEI Statement policy in hiring which is specifically intended to promulgate and enforce a political orthodoxy. Dr. Haltigan is seeking to challenge that policy so he can be considered for a job at UC Santa Cruz.

The University's motion to dismiss makes two arguments. First, the University argues that the DEI policy isn't harming Dr. Haltigan because it hasn't had a chance to reject him. This argument misunderstands Article III standing, as plaintiffs may challenge policies which put them at a competitive disadvantage as long as they are ready and able to apply. Second, the University argues that the First Amendment does not protect faculty applicants. Under this argument, there are effectively no limits on the University's power to engage in viewpoint discrimination in hiring. UC's argument is impossible to square with the public university's "special niche" in our constitutional tradition and "the expansive freedoms of speech and thought associated with the university environment." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).

Dr. Haltigan seeks only to be treated fairly and for his application to be considered without respect to his views on issues that have nothing to do with the job. The DEI Statement policy makes that impossible. His claim should proceed.

**FACTUAL BACKGROUND**

UC Santa Cruz requires every candidate for every academic job opening to file a DEI statement. FAC ¶¶ 31−36, 55, 66−70. The University makes clear that applicants who submit a DEI statement which transgresses or fails to say what the University expects will be effectively ruled out of the competition, irrespective of their academic credentials or their qualifications. FAC ¶¶ 33, 55−57.

The University dictates to candidates the necessary content of their statement, in excruciating detail. The University does this in three ways. First, by providing official guidance documents telling candidates how the administration understands certain concepts and directing candidates to understand them the same way. Second, by providing a detailed rubric, telling candidates what to say and how to say it. Third, by providing indirect guidance candidates must consider if they wish to be competitive in the academic job market.

First, Santa Cruz provides official supporting documents on their DEI website, linked to in the job posting, defining the terms "diversity," "equity," and "inclusion" and instructing candidates that their application must also express and incorporate these definitions. FAC ¶¶ 37−38. Reasonable people across academic disciplines can disagree on these terms, but the Univerisity's purpose is to preclude such disagreements and ensure ideological uniformity. The official DEI website also explains to candidates what they are expected to discuss in their DEI statements, and what views they need to espouse to be considered.

Second, UC Santa Cruz ensures that candidates know what to say in their DEI statements by providing candidates and search committees with a detailed scoring rubric. This rubric instructs candidates that they will be evaluated along several dimensions. FAC ¶¶ 42−44. The first dimension is on their "knowledge" of certain DEI concepts and ideas. FAC ¶ 44. This expressly requires applicants to demonstrate comprehensive understanding of and adherence to DEI orthodoxy. FAC ¶¶ 40−41, 45−46. The rubric also essentially asks applicants to recite aspects of their background

or to give empty affirmations demonstrating their devotion to certain ideas, particularly about race and sex. *Id.* Applicants understand from this rubric—and are meant to understand—that their DEI statements must recite the importance of hiring and advancing individuals based on their racial or ethnic background, and that their DEI statements cannot express any skepticism of these ideas. FAC ¶¶ 52−57. Specific viewpoints—like opposition to racial affinity groups or belief in merit-based advancement—are expressly disfavored in the rubric and automatically return low scores.

The third way the University dictates to candidates is indirectly, through documents and statements made by the University that applicants reasonably must consider. For example, the University publishes on its Academic Personnel Office website a list of "common myths" about DEI in faculty recruitment. FAC ¶ 47. It states that the University is committed to race-conscious hiring and that opinions and debate on this question are unwelcome. FAC ¶¶ 48−49. Its purpose is to impart this message to applicants and professors. Similarly, on the webpage for the Psychology Department are "DEI Resources." FAC ¶ 50. This page describes the importance of race-conscious decision-making and the importance of race and gender balancing in strident terms, embracing a host of controversial political perspectives. FAC ¶ 51. The purpose of this page is to tell applicants what views are acceptable, and which statements will disqualify them from consideration.

The message the University is sending was received loud and clear by Dr. Haltigan: applicants who wish to be considered for a job must affirm the University's political ideology on these issues. So, in the spring, when Dr. Haltigan, while engaged in an active job search, learned about the job opportunity at UC Santa Cruz at which he would be a fit, he knew that he could not compete because of his views. Actually filing an application would have faced him with an unfair choice— conform his views and file a dishonest DEI statement, perhaps recanting his public statements, or face humiliating rejection and further unemployment. When he sued,

1  this position was still available, and the University is likely to post others like it in

2  the future.

3  **LEGAL STANDARD**

4  Under Article III, federal courts can only consider cases or controversies. To

5  satisfy Article III's standing requirements, a plaintiff must show that it has suffered

6  an (1) injury in fact, that is concrete, particularized, and not "conjectural or

7  hypothetical"; (2) that this injury is "fairly traceable to the challenged action"; and

8  (3) that the injury is likely to be redressed by a favorable decision. *See Lujan v.*

9  *Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

10  Standing is assessed at the "outset of the litigation." *See Friends of the Earth,*

11  *Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). *Wilbur v. Locke*, 423

12  F.3d 1101, 1107 (9th Cir. 2005), *abrogated on other grounds by Levin v. Com. Energy,*

13  *Inc.*, 560 U.S. 413 (2010) ("As with all questions of subject matter jurisdiction except

14  mootness, standing is determined as of the date of the filing of the complaint.").

15  Plaintiffs have the burden to establish standing, and both the trial and reviewing

16  courts must accept as true all material allegations of the complaint and must construe

17  the complaint in favor of the complaining party. *Id.* Furthermore, when considering a

18  motion to dismiss pursuant to Rule 12(b)(1), the district court "may review any

19  evidence, such as affidavits and testimony, to resolve factual disputes concerning the

20  existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

21  Similarly, on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts must

22  take all facts in the complaint as true, make all reasonable inferences in favor of the

23  plaintiffs, and determine whether the complaint states a plausible claim for relief.

24  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially plausible when a

25  plaintiff pleads "factual content that allows the court to draw the reasonable inference

26  that the defendant is liable for the misconduct alleged." *Id.* There is no "probability

27  requirement" at the pleading stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556

28  (2007). Instead, plaintiffs must allege facts sufficient to "raise a reasonable

expectation that discovery will reveal evidence" that plaintiffs are entitled to relief. *Id.* A well-pleaded complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (cleaned up).

## ARGUMENT

### I.  Plaintiff has standing

The University's DEI Statement policy prevents Dr. Haltigan from fairly competing for any University positions and has effectively barred him from a UC Santa Cruz position which he wanted and was ready, willing, and able to apply for at the time he filed his complaint. FAC ¶¶ 69−70. Nonetheless, the University insists that Dr. Haltigan is unaffected by the policy.

The University's narrow theory of injury is wrong for three reasons: First, Dr. Haltigan was ready and able to apply to a job opening at the time of filing and remains ready and able—but is terminally disadvantaged by the discriminatory policy. In such cases, it is the barrier itself which inflicts the injury, not the plaintiff's inability to obtain the benefit. Second, Dr. Haltigan's free expression is chilled by the policy; if he were to apply, he would be forced to self-censor or recant his past statements. Under those circumstances, a preemptive challenge is appropriate; forcing him to apply first would subject him to unnecessary injury. Third, the policy is certain to prevent Dr. Haltigan from fairly competing for future and current opportunities.

### A. Dr. Haltigan suffered a redressable injury at the time of filing because he was ready and able to apply

Defendants argue that Dr. Haltigan has failed to allege a concrete, particularized injury. But in fact, Dr. Haltigan's complaint is based on a specific job opening at UC Santa Cruz to which he is ready and able to apply and which was available at the time of filing—but not to him. In his attached Declaration (Exhibit A), Dr. Haltigan makes clear that he was and is ready and able to apply but has not

done so because of the existence of the challenged policy, which he alleges violates his First Amendment rights. This is a justiciable injury.

The Supreme Court has repeatedly held that candidates can challenge a discriminatory policy without subjecting themselves to the policy if they are "ready and able" to apply at the time they file the complaint. For example, in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, the Supreme Court considered whether an association of general contractors had standing to challenge a city ordinance which provided preferential treatment to minority contractors. 508 U.S. 656, 658 (1993). The association did not attempt to show that its members would have received contracts absent the ordinance, but the Court nonetheless held that they had established an injury. As the Court explained, the injury in question was from the "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* at 666. *See also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (parents have standing to challenge race-based public high school placement based on desire not to have to "compete for seats" in an unfair system); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (student had standing to challenge affirmative action rules when he demonstrated that he was "'able and ready' to apply as a transfer student should the [u]niversity cease to use race in undergraduate admissions"). Similarly, in *Carney v. Adams*, the court evaluated whether a lawyer could have standing to challenge judicial eligibility requirements under the First Amendment. 141 S. Ct. 493, 499–500 (2020). As the Court explained, the question was simply whether the plaintiff had shown he was "able and ready" to apply. *Id.* Although the Court decided that on "this particular record" the plaintiff lacked standing, the Court confirmed that a plaintiffs in general can show sufficient willingness to apply so as to have concrete and particularized injury from a barrier. *Id.* at 501 (observing that in this "highly fact-specific case," the evidence had failed to show the plaintiff was "ready and able" to apply).

1    Similarly, the Ninth Circuit has confirmed that plaintiffs who are put at a
2    disadvantage in a competitive process have standing to challenge that process, even
3    without applying. For example, in *Planned Parenthood of Greater Washington*, the
4    Ninth Circuit held that a Planned Parenthood organization had standing to challenge
5    a government funding opportunity, based on their allegation that they could not
6    compete under the allegedly illegal criteria, despite that they failed to put in any bids.
7    *See Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health &*
8    *Hum. Servs.*, 946 F.3d 1100, 1106 (9th Cir. 2020). The court explained that it didn't
9    matter whether Planned Parenthood could have won a bid under the illegal criteria;
10   "[t]he key is that the injury is the increase in competition rather than the ultimate
11   denial of an application, the loss of sales, or the loss of a job." *Id.* at 1108. In such a
12   case, Planned Parenthood had only to show that it was "able and ready" to bid at the
13   time the complaint was filed. *Id. See also Bras v. California Pub. Utilities Comm'n*, 59
14   F.3d 869, 873–74 (9th Cir. 1995) (plaintiff who challenged racial preference program
15   had standing to challenge program based on evidence he had provided services for 20
16   years, was able and ready to continue providing services, but was disadvantaged by
17   program).

18       Here, Dr. Haltigan is in precisely the same shoes as Planned Parenthood—he
19   was able and ready to compete for a job at the time he filed his complaint, but he was
20   disadvantaged by the DEI Statement policy (which in fact, rendered his application
21   futile). And unlike the plaintiff in *Carney*, Dr. Haltigan's interest was more than
22   simply that he would "consider" applying to a future opening—at the time he filed his
23   complaint, there was an actual job that he was qualified for and that he wanted. And
24   there is no question that, under the allegations in the complaint, the DEI Statement
25   policy discriminates and puts certain applicants at a disadvantage—that is the entire
26   point of the policy. This disadvantage is the injury, not whether or not Dr. Haltigan
27   would have gotten a job.

28       Nothing in the University's motion is meaningfully to the contrary because the

University misunderstands the nature of this competitive injury. The University's main contention is that Dr. Haltigan failed to point to a specific position that he had applied for, *see* Motion to Dismiss (MTD) at 7–8, but as explained, the injury here is the harm from the denial of fair treatment, not the denial of a particular benefit. *See Jacksonville*, 508 U.S. at 666. Even the cases cited by the University acknowledge this distinction. *See Dragovich v. U.S. Dep't of the Treasury*, 764 F. Supp. 2d 1178, 1186–87 (N.D. Cal. 2011) (pointing out that defendants "misunderstand[] the nature of the injury alleged, namely Plaintiffs' inability to be considered on an equal basis as other California public employees"), *cited in* MTD at 8–9. As *Dragovich* states, the actual standing inquiry when a plaintiff is unable to compete "on an equal basis" for a benefit is whether the plaintiff is "able and ready" to apply. In *Dragovich* itself, the Court concluded that plaintiffs had standing to challenge federal rules which prevented them—as same-sex couples—from obtaining certain CalPERs benefits, notwithstanding that the plaintiffs had not applied for the program. *Id.* at 1187. The same is true here.[1]

For the same reasons, the University's arguments on traceability and timeframe fail. The University argues that Dr. Haltigan "cannot allege" that he would be interested in an available future position at UC Santa Cruz, and that he seeks only prospective relief. MTD at 10–11. But again, Dr. Haltigan's competitive injury comes from the fact that he was able and ready to apply at the time he filed his complaint, so it does not matter for purposes of standing whether there would be a future job for

---

[1] The University misstates the standard when it argues that Dr. Haltigan was not injured because he has failed to show that he has been "unambiguously precluded" from being hired. MTD at 9. In *Planned Parenthood*, as well as in the racial preference cases like *Jacksonville* and *Bras*, courts do not require a showing that the challenged barrier totally precludes the benefit—instead, the courts repeatedly say that the injury comes from the "increase in competition" or the "denial of equal treatment." *See, e.g., Jacksonville*, 508 U.S. at 666; *Planned Parenthood*, 946 F.3d at 1108; *Bras*, 59 F.3d at 873. The very purpose of the DEI Statement policy, of course, is to disadvantage people with views like Dr. Haltigan's. Furthermore, Dr. Haltigan's allegations—which must be taken as true for purposes of this motion—show that the DEI Statement requirement, in the context of competitive academic hiring, does *preclude him* from consideration. *See, e.g.*, FAC ¶¶ 53–57, 66–70.

him.[2] Like the plaintiffs in *Planned Parenthood*, Dr. Haltigan correctly understood that an unconstitutional government policy put him at a serious disadvantage in a competitive process for a position he wanted. This is a concrete injury.

### B. Dr. Haltigan does not have to subject himself to unconstitutional compelled speech to challenge the policy

Even setting aside the competitive injury, Dr. Haltigan is entitled to file a preemptive suit because the DEI Statement policy threatens his First Amendment interests. Dr. Haltigan alleges that the DEI Statement policy would essentially force him to express ideas with which he disagrees. FAC ¶¶ 74–76. The Constitution does not force him to choose between the Scylla of submitting a predoomed application or the Charybdis of lying and being a hypocrite in order to earn the right to sue.

In First Amendment cases, "it is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). As the Ninth Circuit has explained, where speech rights are at stake, the Supreme Court has endorsed a "hold your tongue and challenge now" approach. *Id.* If the challenged provision threatens First Amendment rights, the inquiry tilts "dramatically [in favor of] standing." *Id.* For example, in *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1030 (9th Cir. 2006), an organization that wanted to hold a march in Santa Monica sued to challenge the city's permit requirements, which it regarded as overly cumbersome. The court concluded it did not matter that it had never sought a permit and has never been subject to enforcement or even had a march in Santa Monica. All

---

[2] Although the University's motion didn't raise the issue, this case is not rendered moot because the University has closed the job opening in question. University job openings come and go far too quickly for effective litigation, making this the ideal case for the mootness exception for injuries "capable of repetition yet evading review." *See, e.g.*, *Planned Parenthood*, 946 F.3d at 1109–10 (case not moot even though challenged funding opportunity had closed where funding opportunity was less than two years and government had demonstrated no intention to change course).

1   that mattered was that the plaintiff had changed its behavior because of the law. *Id.*
2   at 1034. *See also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56
3   (1988) (plaintiffs subject to licensing statute may challenge it without first applying
4   for or being denied a license).

5       Although Dr. Haltigan is not seeking a license or a permit, these cases apply
6   just as well to his situation. His only alternative to a lawsuit is to "yield[] to [the]
7   demands" of the DEI Statement policy. *See City of Lakewood*, 486 U.S. at 756. The
8   Constitution does not require that outcome.

9       **C. Dr. Haltigan is very likely to be subject to the DEI Statement policy**
10      **when he applies for a job in the future**

11      Finally, Dr. Haltigan is injured because he is still looking for a job and expects
12  to apply to UC Santa Cruz in the future. FAC ¶¶ 68–70. There is nothing conjectural
13  or hypothetical about this claim. The University is constantly hiring and will
14  inevitably post (another) job opening that Dr. Haltigan is qualified for. It is more than
15  a substantial risk, but practically a certainty, that he will still be precluded by the
16  policy and thus injured. *See, e.g.*, *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir.
17  2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (future
18  injury suffices for standing if the injury is impending, or there is a substantial risk
19  the harm will occur).

20  **II.   Dr. Haltigan has adequately alleged a viewpoint discrimination claim**

21      UC Santa Cruz's DEI Statement policy violates the First Amendment by
22  casting a "pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. The First
23  Amendment strongly protects academic freedom, i.e., the freedom for teachers and
24  students at universities to think, write, and speak. *Id. See also Baggett v. Bullitt*, 377
25  U.S. 360, 374 (1964) (striking down loyalty oath as unconstitutionally vague on behalf
26  of teachers and students at University of Washington). The Supreme Court has
27  repeatedly reaffirmed that "[o]ur Nation is deeply committed to safeguarding
28  academic freedom, which is of transcendent value to all of us and not merely to the

1    teachers concerned." *Keyishian*, 385 U.S. at 603. This is because the "classroom is
2    peculiarly the 'marketplace of ideas'" and "any strait jacket upon the intellectual
3    leaders in our colleges and universities would imperil the future of our nation." *Id.*
4    (cleaned up). *See also Grutter*, 539 U.S. at 329 (observing that universities occupy a
5    "special niche" in constitutional tradition).

6    　　　Despite this precedent, the University argues that its DEI Statement policy
7    does not even involve any First Amendment interests because it relates only to the
8    University's operations, and the University is entitled to ensure job applicants can do
9    the job they are hired for. This argument has two major problems.

10   　　　First, the University's description of the DEI Statement requirement is in direct
11   opposition to Plaintiff's allegations, which make clear that the DEI Statement policy
12   has nothing to do with the "operation and mission" of a public university. MTD at 14.
13   Rather, the DEI Statement policy is a political litmus test, designed to filter and
14   screen out ideologically unwelcome applicants. The alleged facts illustrate why
15   universities cannot have unfettered discretion to use their job application process to
16   engage in political and viewpoint discrimination without completely demolishing the
17   values articulated in cases like *Keyishian*.

18   　　　The second problem is that there is no limiting principle to the University's
19   argument—the mere fact that a political litmus test is placed in a job application
20   cannot insulate it from the First Amendment. The University's arguments, if
21   accepted, would do tremendous damage to academic freedom and the "special niche"
22   it holds in our constitutional tradition. *Bollinger*, 539 U.S. at 329. It would allow
23   universities to accomplish indirectly what cannot be done directly. *Students for Fair
24   Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2176 (2023).

25   　　　Since the First Amendment must apply to the DEI Statement policy, *Pickering*
26   balancing applies. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391
27   U.S. 563, 568 (1968). That flexible test gives the University plenty of room to protect
28   its legitimate interests in job applications but does not allow it to flagrantly

discriminate based on viewpoint, as it is doing here.

### A. The Amended Complaint alleges sufficient facts to show that the DEI Statement policy is a political litmus test

The University seeks to characterize the DEI Statement policy as an innocuous requirement, which merely evaluates applicants' ability to perform their "official duties." MTD at 14–15. Accordingly, they argue it should be entirely outside the scope of First Amendment protection. This characterization of the DEI policy utterly ignores Dr. Haltigan's actual allegations in this case.

Rule 8 requires plaintiffs to include a "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The factual allegations in the complaint must be taken as "true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. In contrast with factual allegations, the court need not accept as true "a legal conclusion." *Id.* A plaintiff's allegations need only be detailed enough to "give fair notice" and to set the stage for discovery, to learn more about the underlying facts. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Here, Dr. Haltigan makes a series of factual allegations, which, accepted as true, show that the University's DEI Statement policy is a political litmus test deployed for the purpose—and having the effect of—excluding people with contrary views on a range of issues, particularly with respect to race, ethnicity, gender, and merit. FAC ¶¶ 36–57. For example, according to the amended complaint, the UC system uses DEI Statements to "pursue ideological conformity and a vision of diversity focused on racial, ethnic, and gender balancing." FAC ¶ 16. The Amended Complaint further alleges that UC Santa Cruz's website states that the University's understanding of diversity is about hiring and promoting individuals from specific racial and ethnic groups. *Id.* ¶ 37. And that UC Santa Cruz "defines the terms 'diversity,' 'equity,' and 'inclusion' in a specific manner that ensures successful applicants adhere to a particular ideology and worldview." *Id.* ¶ 38. The First Amended Complaint also details that UC Santa Cruz's website discloses a scoring

rubric where "an applicant must express agreement with specific sociopolitical ideas, including the view that treating individuals differently based on their race or sex is desirable" to receive a high score. *Id.* ¶ 43. And the First Amended Complaint alleges that "[u]nder the rubric, low scores are specifically promised for applicants that believe race and sex should not be used to judge individuals." *Id.* ¶ 46. The First Amended Complaint explains that these demands on applicants have nothing to do with qualifications, professional standards, or the University's mission. *Id.* ¶ 54. Instead, "the guidelines, rubrics, and reference materials are intended to require applicants to repeatedly attest to particular beliefs to be considered for a position." *Id.* ¶ 53.

These are not conclusory or legal allegations—they are allegations of facts, which, taken as true, paint a picture of the DEI Statement requirement. Far from being, as the University says, "plainly part of UC Santa Cruz's efforts to evaluate applicants' ability to perform their official duties," MTD at 15, the DEI Statement requirement is about ensuring ideological conformity on issues far removed from those "official duties"—particularly, race- and sex-based affirmative action, merit-based evaluation, and viewpoint diversity.

If the complaint's allegations are taken seriously, there is no doubt that the DEI Statement requirement seeks to probe applicants for viewpoints unrelated to the job and compels them to affirm the University's view on political issues.

**B. The First Amendment has long prohibited universities from conditioning teaching jobs on adopting the university's political ideology**

In the face of these factual allegations, the University nonetheless argues that the DEI Statement requirement should be completely immune from First Amendment scrutiny. According to the University, its interests in ensuring that applicants "will perform their duties" places statements in job applications outside the scope of the First Amendment. MTD at 12–15. However, the University ignores the long history of the Supreme Court employing a careful eye to ensure that public academic

1  institutions do not leverage jobs to coerce or compel speech. That is precisely what is
2  occurring here.

3      In *Pickering*, a public school teacher wrote a letter to a local newspaper
4  criticizing the school board and superintendent. 391 U.S. at 564. The school district
5  terminated the teacher, claiming that the letter "was 'detrimental to the efficient
6  operation and administration of the schools of the district.'" *Id.* The teacher sued on
7  First Amendment grounds. The Court held that teachers cannot be "compelled to
8  relinquish their First Amendment rights" to "comment on matters of public interest
9  in connection with the operation of the public schools in which they work." *Id.* at 568.
10 Accordingly, *Pickering* requires courts to balance "the interests of the teacher, as a
11 citizen, in commenting upon matters of public concern and the interest of the State,
12 as an employer, in promoting the efficiency of the public services it performs through
13 its employees." *Id.*

14     *Garcetti v. Ceballos* did not change this overarching rule. 547 U.S. 410 (2006).
15 In *Garcetti*, a deputy district attorney was subject to adverse employment actions for
16 his statements at work about a purely case-related matter, pursuant to his duties as
17 a prosecutor. The Court held that speech of this type—purely pursuant to official
18 duties—is not insulated from employer discipline by the First Amendment. *Id.* at
19 421−22. But the Court did not overturn *Pickering* or decide that government
20 employees surrendered their free speech rights. Rather, the Court was clear that
21 "[t]he First Amendment limits the ability of a public employer to leverage the
22 employment relationship to restrict, incidentally or intentionally, the liberties
23 employees enjoy in their capacities as private citizens." *Id.* at 419. The Court was also
24 clear that the proper inquiry as to whether the First Amendment applies is "practical;"
25 for example, the Court rejected the idea that an employer can restrict employee rights
26 by using broad job descriptions. *Id.* at 424−25. Finally, the Court expressly reserved
27 how this framework might interact with academic freedom and acknowledged the
28 "additional constitutional interests" implicated in that context. *Id.* at 425.

These "additional constitutional interests" have led the Court to repeatedly recognize the viability of First Amendment claims on behalf of former or aspiring professors or teachers against schools. For example, in *Perry v. Sindermann*, the Court considered whether a professor whose one-year contract was not renewed had stated a bona fide First Amendment retaliation claim. 408 U.S. 593 (1972). The plaintiff had joined a political organization and testified before the state legislature taking positions that his college's administration opposed. *Id.* at 594. At the end of that school year, when his contract expired, the college decided not to rehire him. *Id.* He then filed a lawsuit alleging "that his nonretention was based on his testimony before legislative committees and his other public statements critical of the Regents' policies." *Id.* at 598. The Court concluded that he stated a claim and that summary judgment should not have been granted to the college. *Id.* The Court explained that "a teacher's public criticism of his superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of his employment." *Id.* (citing *Pickering*).

Similarly, in *Shelton v. Tucker*, the Court struck down a state law requiring public school teachers to complete an affidavit disclosing all organizations that they have been members of or paid dues to. 364 U.S. 479, 483, 488 (1960). The Court reasoned that the requirement was overbroad because it compelled disclosure of affiliations and relationships that "could have no possible bearing upon the teacher's occupational competence or fitness," such as the church that they attend and their political party. *Id.* at 488. The Court concluded that this overbroad condition of employment violated the First Amendment because it chilled "that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers." *Id.* at 487.

Following cases like these which recognized the significance of academic freedom, the Ninth Circuit has carefully limited *Garcetti* and stated unequivocally that it does not apply to "[s]peech related to scholarship or teaching." *Demers v.*

*Austin*, 746 F.3d 402, 414 (9th Cir. 2014). In *Demers*, the court considered whether a seven-step reorganization plan sent to the provost and the president by an associate professor who was a member of the Structure Committee and the Mass Communication Committee was protected by the First Amendment. The court first determined that this speech was pursuant to his official duties as a member of those committees, and so within the scope of *Garcetti*. *Id.* at 410. However, the court held that the plan was "related to" scholarship and carved out a broad exception to *Garcetti* for all such speech. *Id.* at 411. As a result, the court in *Demers* concluded that the *Pickering* balancing test had to apply.

These cases demonstrate why the University's arguments that the DEI Statement policy should be outside the scope of the First Amendment fail. First, a political litmus test is not remotely analogous to the "official duties" speech at issue in *Garcetti*. Even within the plain terms of *Garcetti* itself, this is protected speech, as the University is using DEI Statements to probe and evaluate candidates because of their beliefs that have little to do with their jobs. Indeed, there is a significant difference between what the DEI Statement requires of candidates and the sort of job application speech that courts have upheld in the cases cited by Defendants. For example, in *Wetherbe v. Smith*, an unreported Fifth Circuit case the Defendants cite multiple times, the court merely concluded that interview speech should not be "categorically" understood as protected. 593 F. App'x 323, 328 (5th Cir. 2014). And the speech in question was about tenure and other "application-related" issues—plainly much more related to the job than the DEI Statement is alleged to be here. *Id. See also Worrell v. Henry*, 219 F.3d 1197, 1207 (10th Cir. 2000) (applying *Pickering* balancing to hiring decisions, concluding balancing in government's favor because speech could have harmed cohesiveness in law enforcement).

Unlike *Wetherbe*'s discussion of tenure and hiring, it is difficult to understand how the University could believe that a professor's "official duties" include believing that "race and sex should [] be used to judge individuals," or "treating individuals

differently based on their race or sex is desirable." FAC ¶¶ 43, 45–46. This is especially so since treating students differently based on their race or sex is patently unconstitutional under both the United States and California Constitutions. *See Students for Fair Admissions*, 143 S. Ct. at 2172 ("[T]he Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."); Cal. Const. art. I, § 31(a) ("The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."). As the U.S. Supreme Court explained this summer, "[u]niversities may define their missions as they see fit," but those missions must comply with the Constitution and Universities cannot license their faculty to classify students by race for the sake of diversity. 143 S. Ct. at 2168.

But even if the DEI Statement was somehow testing Dr. Haltigan's ability to do the job, the issues it touches on are too sensitive and intimately bound up with teaching and academic writing, especially in the social sciences, to fall outside First Amendment scrutiny. In *Demers*, the Ninth Circuit concluded that a pamphlet expounding on university structure and organization "related to" scholarship sufficiently to be protected by the First Amendment. 746 F.3d at 415. The court explained in that case that "protected academic writing is not confined to scholarship." *Id.* at 416. Much academic writing is, of course, scholarship. But in academics, professors in the "course of their academic duties, also write memoranda, reports, and other documents addressed to such things as a budget, curriculum, departmental structure, and faculty hiring." *Id.* at 416. The Ninth Circuit defined all this as potential scholarship, observing that "[d]epending on its scope and character, such writing may well address matters of public concern under *Pickering*." *Id.* The same is true of a statement filed alongside a job application.

Here, the University is probing social science candidates on their views on issues like race, merit, gender, and the demographic and socioeconomic factors behind

advancement.[3] These issues almost intrinsically involve matters of relevance to academic work. Indeed, Dr. Haltigan alleges that the very purpose of this policy is to influence teaching and writing on a matter of public concern. FAC ¶¶ 52–57. The academic freedom discussed in *Keyishian* will not survive if university administrators can dictate orthodox answers to disputed questions in hiring announcements without any constitutional guardrails. *See Keyishian*, 385 U.S. at 603 (discussing the importance of the "marketplace of ideas" and the need to eschew "authoritative selection"). Universities cannot have such unfettered discretion to engage in deliberate viewpoint discrimination in job applications.

As the Supreme Court explained in *NEA v. Finley*, that case would have been different if it had been an as-applied challenge alleging "invidious viewpoint discrimination." 524 U.S. 569, 586–87 (1998). Even in the competitive context of subsidies, the government may not "aim at the suppression of dangerous ideas" or "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" because the government may not suppress specific viewpoints. *Id.* at 586–88 (cleaned up). The NEA itself conceded in that case that if it had been trying to "drive certain ideas or viewpoints from the marketplace" then that would present a different—and more pressing—constitutional question. *Id.* at 587.

But Dr. Haltigan alleges that the University is doing exactly what *Finley* feared: attempting to drive particular views out of the marketplace and control academic expression. These actions cannot be immune from First Amendment scrutiny. The University has interests in hiring, of course, but the correct way to incorporate the University's interests is to apply the balancing test the Supreme Court articulated in *Pickering*. Under that balancing test, Dr. Haltigan has stated a claim

---

[3] For this reason, *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573 (4th Cir. 2023), has no relevance; there, the unprotected communications referenced "matters of personal interest" and "complaints over office affairs" and included an unprofessional attack on his colleagues. *Id.* at 584. By contrast, here, the University has a policy to ask applicants about sensitive, political issues intimately tied up with disputed issues in social science. It is impossible to separate the issues the University is asking about from scholarship.

1   for relief.

2   **C. Dr. Haltigan has adequately alleged that the DEI Statement policy
        will effectively bar his application**

3

4       The DEI Statement requirement effectively bars protected speech—that is its

5   purpose. The Defendants' remaining arguments—that Dr. Haltigan has failed to

6   adequately allege an adverse effect or that he has failed to allege a causal connection—

7   both fail for many of the same reasons discussed in the standing section. Most

8   importantly, the University's arguments rest on disputes over the fundamental facts

9   which are inappropriate to resolve at this stage of the litigation. *See Twombly*, 550

10  U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge

11  that actual proof of those facts is improbable.").

12      The University argues that Dr. Haltigan has failed to allege that the policy

13  would impact him because he failed to apply. However, numerous courts have

14  concluded that plaintiffs alleging discrimination or retaliation do not have to apply if

15  the application would have been futile. *See, e.g.*, *Shackelford v. Deloitte & Touche,*

16  *LLP*, 190 F.3d 398, 406 (5th Cir. 1999) (claim of futility depends on showing "known

17  and consistently enforced" policy); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d

18  Cir. 1993) ("[T]he rule is that a plaintiff's failure to apply for a position is not a bar to

19  relief when an employer's discriminatory practices deter application or make

20  application a futile endeavor.") (citing *International Bhd. of Teamsters v. United*

21  *States*, 431 U.S. 324, 364−67 (1977)); *Terry v. A.C. Cook*, 866 F.2d 373, 378−79 (11th

22  Cir. 1989) (in civil rights claim, "[c]ourts have long recognized circumstances in which

23  a failure to apply may be overcome by facts which demonstrate the futility of such

24  application").

25      As discussed above, the allegations clearly state here that Dr. Haltigan's

26  application is futile, and on the plain terms of the DEI policies articulated by the

27  University, he cannot compete. *See, e.g.*, FAC ¶¶ 53−57, 66−70. The terms of the DEI

28  Statement policy are stated publicly, repeatedly, and in tones that brook no dissent.

And the University does not dispute them here. Dr. Haltigan has every reason to believe these policies are consistently enforced. In fact, Dr. Haltigan alleges that excluding people like him from competing for the job is the purpose of the policy. FAC ¶¶ 56–57. These are factual allegations—the plaintiff is entitled to a chance to prove them even if a court is "doubtful." *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)").

Second, the University argues that Dr. Haltigan has failed to allege that his views would be a motivating factor behind the futility of his application. These arguments are premised on the idea that Dr. Haltigan's allegations on the functioning of the DEI Statement requirement are too vague. MTD at 18–19 (asserting that Plaintiff fails to explain "how his own views are disfavored"). This is not the standard under Rule 8. Plaintiff needs to only provide notice of the claim, and Dr. Haltigan's allegations clearly meet that threshold when, among other things, they make clear that the University's process reserves high application scores only for those who "promise to adhere to a specific world view" and "applicants who fail to demonstrate conformity" have "futile" applications. FAC ¶¶ 45–57. *See also* FAC ¶¶ 16, 37–38, 43, 45–46 (discussing how the University uses DEI Statements to discriminate based on certain views and advance a favored ideology). The University may disagree whether Dr. Haltigan, and others with similar views, are given a fair shake under the DEI Statement policy. But this is a factual dispute, and not appropriate to resolve before discovery.

The University does not assert that Dr. Haltigan's complaint is deficient on the remaining *Pickering* factors. *See* MTD at 12. But even at this early stage, given the Supreme Court's decision in *Students for Fair Admissions*, the University's interests in promulgating an ideology of race preferences directly contrary to the Constitution cannot possibly outweigh Dr. Haltigan's interest in freedom of expression. His viewpoint discrimination claim should go forward.

### III. *Pickering* balancing does not apply to Dr. Haltigan's unconstitutional conditions claim

Even if Dr. Haltigan's viewpoint discrimination claim cannot proceed, he has adequately pled that the DEI Statement imposes an unconstitutional condition on a government benefit. The University's motion misunderstands the fundamental aspects of this cause of action.

Under the unconstitutional conditions doctrine, the government may not condition the receipt of government benefits on an agreement to surrender one's constitutional rights. The doctrine "holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs., Wahaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996). For example, in *Agency for International Development v. Alliance for Open Society International, Inc. (AOSI)*, the Court struck down a statutory requirement that NGOs seeking funding to fight HIV/AIDS have a policy "explicitly opposing prostitution and sex trafficking." 570 U.S. 205, 210 (2013). The Court observed that Congress generally has the authority to impose limits on the use of funds provided via a government program, but that there is a key distinction "between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214−15. Congress had adopted the requirement to eradicate prostitution and sex trafficking and to force grant recipients to adopt a similar stance. *Id.* at 218. By forcing organizations to "pledge allegiance" to this principle and espouse the view of the government, the policy violated the unconstitutional conditions doctrine. *Id.* at 218−19. *See also F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 400 (1984) (editorializing ban for public broadcasters left no way for plaintiff "to make known its views on matters of public importance" with nonfederal funds, imposing unconstitutional condition). In other words, the coercive nature of the DEI Statement

policy makes it more than a typical viewpoint discrimination claim. Rather, this claim is about the way that the University is leveraging the job opportunity to obtain affirmations of belief that "by [their] nature cannot be confined within the scope of the [] program." *AOSI*, 570 U.S. at 221.

Defendants' arguments do not address these issues. Instead, they argue three points. First, they assert that Dr. Haltigan has not been compelled because he has not applied—but as explained in the standing argument, Dr. Haltigan's preemptive claim is intended to head off an imminent injury. Dr. Haltigan alleges that he *would* be compelled if he did apply. *See* FAC ¶¶ 70−78. This is sufficient to warrant prospective relief. Next, Defendants argue that there is no compulsion because Dr. Haltigan is free to write whatever he wants for his DEI Statement—but this is the same as saying that there can never be an unconstitutional condition because the individual can always refuse the benefit. The University's argument would have worked just as well for the plaintiff in *AOSI*. The plaintiff in that case could have just agreed to pledge itself to the government's views on prostitution. That they didn't have to is the entire point of the doctrine. The Supreme Court has repeatedly stated that conditions which "seek to leverage funding to regulate speech outside the contours of the program" are unconstitutional, notwithstanding whether there is an entitlement or an ability to refuse the benefit. *See AOSI*, 570 U.S. at 214−15. And finally, the University argues that there can be no problem with compelled speech because the DEI Statement bears on the applicant's "official duties." MTD at 22. This last objection simply begs the question; the issue presented by this claim is whether the DEI Statement policy is "within the scope of the program." *AOSI*, 570 U.S. at 218−19. Dr. Haltigan alleges that it is outside any reasonable understanding of the scope of an academic position to force applicants to express their belief with contested and ideological premises on race, gender, and ethnicity. FAC ¶¶ 75−78. The University does not meaningfully respond to this point.

1

## **CONCLUSION**

2           The motion to dismiss should be denied.

3     DATED: September 5, 2023.

4                                                      Respectfully submitted,

5                                                      JOSHUA P. THOMPSON
                                                       WILSON C. FREEMAN*
6                                                      JACK E. BROWN*

7
                                                       By ____/s/ Wilson C. Freeman_____
8                                                              WILSON C. FREEMAN*

9                                                      *Attorneys for Plaintiff*

10                                                     *pro hac vice*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 5, 2023, Opposing Counsel received the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT via CM/ECF service.


By ___/s/ Wilson C. Freeman_____
        WILSON C. FREEMAN*

*Attorney for Plaintiff*

*\*pro hac vice*