JOSHUA P. THOMPSON, No. 250955
Email: jthompson@pacificlegal.org
WILSON C. FREEMAN, Ariz. Bar. No. 036953*
Email: wfreeman@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JACK E. BROWN, Va. Bar No. 94680*
Email: jbrown@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747

*Attorneys for Plaintiff*
*pro hac vice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| JOHN D. HALTIGAN, | No. 5:23-cv-2437-NC |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. |  |
| MICHAEL V. DRAKE, in his official capacity as President of the University of California; CYNTHIA K. LARIVE, in her official capacity as Chancellor of UC Santa Cruz; BENJAMIN C. STORM, in his official capacity as Chair of the UC Santa Cruz Psychology Department; and KATHARYNE MITCHELL, in her official capacity as Dean of the UC Santa Cruz Division of Social Sciences, |  |
| Defendants. |  |

**INTRODUCTION**

1.     The University of California (University or UC) has adopted a modern-day loyalty oath for professors who seek to join the faculty. Today's loyalty oath does not demand a pledge that professors are not members of the Communist Party, but professed agreement with "Diversity, Equity, and Inclusion" (DEI) policies and ideology. The DEI Statements demanded by the University are a thinly veiled attempt to ensure dogmatic conformity throughout the university system.

2.     This requirement is imposed on every applicant to a faculty position in the University by means of a DEI Statement Requirement which applicants must clear in order to even get a foot in the door. The University administration ensures conformity and compliance by promulgating detailed rubrics and guidelines that tell applicants exactly what to say and what not to say in their Statements.

3.     Dr. John D. Haltigan challenges this functional loyalty oath as a violation of his rights under the First Amendment. He has a PhD in Developmental Psychology and is ready and able to apply to a position at UC Santa Cruz, but the stringent ideological requirements of the DEI Statement make his application futile.

4.     Dr. Haltigan is challenging the University of California's DEI Statement Requirement because what was true for the anti-communist loyalty oaths of the Cold War era is still true today: The First Amendment does not tolerate laws that cast a pall of orthodoxy over the classroom. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Academic freedom and freedom of expression demand that mandatory DEI Statements meet the same fate as the loyalty oaths of previous generations.

**JURISDICTION AND VENUE**

5.     This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction over this federal claim under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (redress for

deprivation of civil rights). Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and continue to occur in this district.

## PARTIES

7.      Plaintiff John D. Haltigan is a U.S. citizen and resident of Pennsylvania. He has a PhD in Developmental Psychology from the University of Miami, and until early in 2023 served as an Assistant Professor in the Department of Psychiatry at the University of Toronto.

8.      Defendant Michael V. Drake is the President of the University of California and is sued in his official capacity.

9.      Defendant Cynthia K. Larive is the Chancellor of UC Santa Cruz and is sued in her official capacity.

10.     Defendant Benjamin C. Storm is a professor of psychology and the Chair of the UC Santa Cruz Psychology Department. He is sued in his official capacity.

11.     Defendant Katharyne Mitchell is a professor of sociology and the Dean of the UC Santa Cruz Division of Social Sciences. She is sued in her official capacity.

## FACTUAL BACKGROUND

**The Evolution of the DEI Statement in the University of California**

12.     The University of California has long considered diversity to be an important value in faculty hiring.

13.     Accordingly, in 2005, the University of California published a new section of its Academic Personnel Manual (APM) encouraging "diversity and equal opportunity." This section was designed to ensure that faculty which put effort into promoting equal opportunity and diversity receive some credit, but not to displace or substitute for scholarly rigor, objectivity, and originality.

14.     Under the 2005 version of the APM, applicants were asked for DEI statements, but they were rarely decisive; DEI statements were weighed alongside more traditional measures of aptitude, including academic success, publications, research plans, and teaching ability.

15.     Nor did the University provide prescriptive DEI statement guidelines and rubrics; the prevailing understanding of academic freedom prohibited the administration from dictating to faculty search committees about the beliefs of prospective academics.

16.     Gradually, however, the University of California began to come under pressure to use DEI statements more aggressively to pursue ideological conformity and a vision of diversity focused on racial, ethnic, and gender balancing.

17.     In 2015, the APM provision was revised, to add language that emphasized the importance of DEI achievement as compared to other traditional academic criteria.

18.     In 2016, the California Budget Act allocated $2 million to promote racial and gender diversity, requiring a report from the University on fund usage and the racial/ethnic and gender composition of the University.

19.     As a result, UC established the Advancing Faculty Diversity (AFD) program, which supports projects to increase racial and gender balance on UC campuses.

20.     In November 2017, the UC Office of the President (UCOP) issued a detailed report on its use of the state funds.

21.     The UCOP explained that the UC system was "particularly focused" on increasing diversity along racial and ethnic lines.

22.     The UCOP Report highlighted a number of tools that particular departments or campuses could use to achieve the goal of enhanced racial and ethnic balance, including DEI statements.

23.     As explained in the UCOP Report, AFD had allocated the state's funds to pilot programs that aimed to advance faculty racial and ethnic balancing within the constraint of Prop 209.

24.     Among these programs was $600,000 for a UC Riverside program in the College of Engineering, which involved a unique approach to diversity statements.

25.     UCOP highlighted UC Riverside as particularly successful because it resulted in a ten-fold increase in underrepresented minority finalists and a doubling of female representation.

26.     According to UCOP, UC Riverside's success derived from their use of a simple rubric measuring research and diversity statements and particularly from their evaluation of DEI statements from the beginning of the candidate evaluation process and as part of the initial candidate screening.

27.     In the following years, AFD received more state funding and has continued to build on its program to pursue racial balancing and ideological conformity and apply the lessons from the original effort. In 2018−19, AFD launched a grant program supporting campus efforts to increase diversity. This grant program is ongoing.

28.     AFD has since launched five recruitment projects aiming to increase racial balance, at a total cost of about $2.5 million, including a pilot program at UC Santa Cruz.

29.     The AFD-funded pilot program at UC Santa Cruz focused on several elements. Most importantly, it emphasized that DEI statements should be an "important part" of the selection process, which must be considered in the first round of review. The program also encouraged search committees to engage in more in-depth discussions about the value of these statements.

30.     However, some search committees at UC Santa Cruz disregarded the emphasis on screening based on DEI statements, fearing they might lose top candidates.

31.     This led the University and the administration on the Santa Cruz campus to refocus search committees on the importance of using DEI Statements aggressively.

32.     Collectively, these initiatives and pressures have utterly transformed the DEI Statement's purpose and use in the University of California system.

33.     Importantly, this transformation involved the widespread adoption of the UC Riverside experiment to perform an initial screening of candidates based only on the diversity statements (the Initial Screening Requirement).

34.     The other major change has been the widespread adoption of detailed rubrics and guidelines to ensure uniformity.

35.     For example, around the same time that the California State legislature was giving money to the University to adjust the racial and gender balance in its faculty, the University's Academic Personnel and Programs Office (APP) issued more detailed guidelines for evaluating DEI statements.

**DEI Statements as Ideological Litmus Tests at UC Santa Cruz**

36.     Following these developments, UC Santa Cruz now provides prospective applicants with detailed guidelines on what to say and what not to say on their DEI statements.

37.     On the main "Diversity" page for the UC Santa Cruz Office of Academic Personnel (APO), UC Santa Cruz makes clear that the University's understanding of diversity is about hiring and promoting individuals from specific racial and ethnic groups.

38.     APO defines the terms "diversity," "equity," and "inclusion" in a specific manner that ensures successful applicants adhere to a particular ideology and worldview.

39.     APO goes on to explain that DEI statements are evaluated in three categories: awareness, experience, and future plans at UC Santa Cruz.

40.    Ideas and beliefs that applicants are supposed to convey are embedded throughout APO's expectations but particularly captured under the "awareness" heading.

41.    Experience and future plans are evaluated based on an applicant's past or planned contributions to diversity, equity, and inclusion in teaching, research and professional work, and service and professional activities. The activities and contributions applicants are asked to discuss are thinly veiled proxies for particular beliefs that the administration favors.

42.    The main diversity page also links to a "starting rubric," to further drive home to applicants exactly what they must say to pass through the DEI filter.[1]

43.    To receive a high score under the terms set by the rubric, an applicant must express agreement with specific sociopolitical ideas, including the view that treating individuals differently based on their race or sex is desirable.

44.    The rubric evaluates DEI statements based on the three criteria mentioned above: awareness (or "knowledge," as the rubric describes it), experience, and future plans, with a scoring range of 1−5 for each. 1−2 represents a low score, 3 represents a mixed score, and 4−5 represents a high score.

45.    For each criterion, high scores are reserved for those who promise to adhere to a specific world view that requires treating individuals differently according to race.

46.    Under the rubric, low scores are specifically promised for applicants that believe race and sex should not be used to judge individuals.

47.    Further orthodoxy for applicants to recite is provided on a list on APO's website of "common myths" about DEI in faculty recruitment and hiring under its "Academic Recruitment Resources" page.[2]

---

[1] *See* UCSC Starting Rubric to Assess Candidate Contributions to Diversity, Equity, and Inclusion, https://apo.ucsc.edu/docs/ucsc-rubrics-c2deistatements.pdf.
[2] *See* UC Merced Academic Personnel Office, *Addressing Common Myths About*

48.     In the common myths document, among other things, the University makes clear its commitment to race-centric hiring and its focus on silencing dissent on these issues.

49.     This document sends a clear message to applicants: those who reject DEI orthodoxy will demonstrate a low "understanding" or "awareness" of DEI and will not be considered for a position at UC Santa Cruz.

50.     Finally, UC Santa Cruz's Psychology Department has a page for Resources on Antiracism under the heading of "DEI Resources."[3]

51.     This page embraces without reservation numerous controversial political and ideological perspectives, including the ideas of controversial author Ibram Kendi, linking to and endorsing multiple speeches and works.

52.     The documents on this page are not presented as academic research, or as the individual perspectives of particular professors, but as the official view of UC Santa Cruz's Psychology Department.

53.     Individually and collectively, the guidelines, rubrics, and reference materials are intended to require applicants to repeatedly attest to particular beliefs to be considered for a position.

54.     The mandatory beliefs have nothing to do with the University's mission, the qualifications for any given tenure-track position, or professional standards for academics. They are about propagating the ephemeral political ideology of the Administration.

55.     Both the DEI Statement Requirement and the Initial Screening Requirement are applicable to every faculty job opening at UC Santa Cruz.

56.     The combined result of this DEI Statement Requirement and the Initial Screening Requirement has created a situation where applicants who fail to

_Diversity and Equity in Faculty Recruitment and Hiring_,
https://academicpersonnel.ucmerced.edu/common-myths-about-diversity-and-equity.
[3] _See_ UC Santa Cruz Psychology Department, _Resources on Antiracism_,
https://psychology.ucsc.edu/about/dei/dei-resources.html.

demonstrate conformity with the beliefs and ideology represented on the APO website know that their application is futile.

57.    This process has the intent and the effect of driving contrary ideas and viewpoints out of the marketplace of academic hiring.

**Dr. Haltigan's Job Search**

58.    Dr. Haltigan first learned about a position at UC Santa Cruz which fit his background and interests in early 2023.

59.    At the time, Dr. Haltigan was (and remains) in a nationwide search for a tenure track position at a university.

60.    Dr. Haltigan's job search is directed at places he would want to live and work, and to departmental openings that fit with his background and interests.

61.    Academic jobs generally require the same materials for each application. Every academic job application requires at least a cover letter, a research statement, a teaching statement, and a curriculum vitae.

62.    Job applicants for academic jobs seldom tailor these materials for the individual position at issue. Applicants often submit the same materials to every position they apply to, only changing a few words in the cover letter.

63.    Many academic jobs also require some sort of statement on diversity. For these statements, candidates often reuse or slightly rework existing statements.

64.    Dr. Haltigan applied to more than ten academic jobs in 2023, including multiple openings in California.

65.    Dr. Haltigan's CV, attached as Exhibit A,[4] states that Dr. Haltigan obtained his PhD in Developmental Psychology from the University of Miami in 2009.

66.    After obtaining his doctorate, Dr. Haltigan served as a postdoctoral fellow first at the University of Illinois at Urbana-Champaign (until 2011), then at the

---

[4] Although the attached application documents are from September of 2023, they reflect only minor changes in the time since the complaint was filed and Dr. Haltigan keeps all these materials ready to go at all times.

University of North Carolina at Greensboro (until 2013), then at the University of Ottawa (until 2016). *Id.*

67.    From 2016 until earlier this year, Dr. Haltigan was an Assistant Professor in the Department of Psychiatry at the University of Toronto. *Id.*

68.    His research interests include "the legacy of early caregiving experiences on child and adolescent environment"; "life history"; "[m]easurement and classification of child and adolescent psychopathology"; and "[l]ongitudinal data modeling." *Id.*

69.    Dr. Haltigan has been a coinvestigator on several research programs operating under federal and other grants, has over 60 publications to his name, and has several additional manuscripts under review. *Id.*

70.    Dr. Haltigan's Research Statement, attached as Exhibit B, further states that his "research program investigates the structure, determinants, course, and co-occurrence of child and adolescent mental and physical illness" and highlights quantitative approaches to address both basic and applied questions in developmental science. *Id.*

71.    Dr. Haltigan's teaching statement, attached as Exhibit C, explains the importance to him of "passionate and personalized subject matter," and discusses his long history teaching and mentoring a diverse array of students.

72.    A sample cover letter that Dr. Haltigan used for a university application in 2023 is attached as Exhibit D.

73.    A sample of significant article reprint or preprints that Dr. Haltigan included in a university application in 2023 is attached as Exhibit E.

**Dr. Haltigan's DEI Statement**

74.    In the midst of his job search, in February 2023, Dr. Haltigan posted a DEI statement he submitted with a recent job application to a university opening on his Substack newsletter. *See* Exhibit F.

75.     As the introductory paragraph explains, Dr. Haltigan submitted the DEI statement to a job because he "strongly believe[s] taking a principled stand against the use of the DEI rubric in the Academy is crucial for the continued survival of our institutions of higher learning as they were intended: bastions of the unfettered pursuit of knowledge and truth and the immersion of its students into the principles of liberal discourse and the development of critical thought." *Id.*

76.     Dr. Haltigan's posted DEI Statement states "I am committed to colorblind inclusivity, viewpoint diversity, merit-based evaluation, and value outreach to underrepresented groups in higher education. Across all of my teaching and mentorship, I have endeavored to treat students and mentees equally, without regard to identity-based characteristics." *Id.*

77.     Dr. Haltigan's DEI statement expressed his fear of being discriminated against due to his viewpoint, observing that "[s]everal recent investigative journalism efforts have documented how DEI statements have been used to screen and penalize applicants for not possessing 'correct' political ideas or endorsing activist ideologies, such as the 'anti-racist' strand of 'scholarship' developed and promoted by Ibram Kendi as well as concepts such as 'intersectionality.'" *Id.*

78.     Dr. Haltigan also writes that he has "provided mentorship to several students from underrepresented minority groups. Many of these students explicitly sought out my mentorship due to my clear position, communicated on social media, that I reject activist 'scholarship' that is neither conceptually coherent nor methodologically sound." *Id.*

**UC Santa Cruz's Psychology Department's Job Opening**

79.     On July 21, 2022, UC Santa Cruz posted an open hiring announcement for a tenure-track position in Developmental Psychology. *See* Exhibit G.

80.     The position stated that the University was "particularly interested in developmental psychology scholars whose research addresses diversity in human development. In addition, we seek a scholar whose research addresses the intersection

of developmental psychology and global and/or community health. Health here is broadly construed to include psychological, mental or physical health with a focus on the well-being of children and youth in their families, peer relations, schools, and/or cultural communities." *Id.*

81.    As with every position at UC Santa Cruz in the Division of Social Sciences, the Psychology Department requires a DEI statement in order to apply, and "urges" candidates to review the scoring rubric explained above. *Id.*

82.    It also makes clear that, consistent with University policy, an initial screening of candidates will be performed using only the DEI statement and a research statement.

83.    In addition to the DEI Statement, the applicant must submit a cover letter, a curriculum vitae, a research statement, a teaching statement, and significant article reprint or preprints.

84.    Dr. Haltigan's application materials at Exhibits A–E satisfy these requirements and could have been submitted to UC Santa Cruz with only minor edits to the cover letter.

85.    UC Santa Cruz posts similar openings in the psychology department on an annual basis. On September 1, 2023, the University posted a hiring announcement for an assistant or associate professor in "quantitative psychology." *See* Exhibit H.

86.    This hiring announcement seeks a candidate with a "PhD in Quantitative Psychology or in another field of Psychology" as long as they have expertise in quantitative methods and demonstrated excellence in teaching statistics. Dr. Haltigan meets these requirements and is currently teaching statistics at the undergraduate level at University of Miami.

87.    This posting, like the other, is conditional on the University's ideologically demanding DEI Statement requirement.

88.    Dr. Haltigan expects the University to continue posting job opportunities that he is interested in going forward.

**Dr. Haltigan's Application Is Futile**

89.     Although Dr. Haltigan has over a decade of experience teaching and mentoring students from all backgrounds, his views on DEI rendered an application to UC Santa Cruz futile.

90.     Dr. Haltigan is aware of research and investigative reports showing that candidates are often eliminated based on DEI statements alone.

91.     For example, a self-survey conducted by UC Santa Cruz's sister school UC Berkeley found that, in one particular faculty search, 76% of applicants were eliminated solely on the basis of their diversity statements.[5]

92.     This is consistent with UC Santa Cruz's approach to using DEI Statements as part of the initial screening process—the University seeks to eliminate candidates with DEI Statements below certain benchmarks without having to consider the application in more detail.

93.     The University's public statements—on its Department of Psychology webpage, on the various hiring resources pages through the APO website, and through its DEI Statement scoring rubric—make it clear that Dr. Haltigan's application would have ended up discarded without consideration of his qualifications entirely on the basis of his views as expressed in the DEI Statement.

94.     A cursory examination of the DEI rubric and other materials used by the University shows that Dr. Haltigan's views on DEI would have led to the dismissal of his application without due consideration. Dr. Haltigan's statements on colorblind meritocracy, his commitment to viewpoint diversity, his skepticism of scholars like Ibram Kendi, his intention to treat all scholars the same regardless of identity-based characteristics, and his rejection of the concepts of intersectionality and "anti-racism",

---

[5] *See, e.g.*, Greg Lukianoff and Rikii Schlott, *Universities Use DEI Statements To Enforce Groupthink*, Reason Magazine (Jan. 6, 2024) (discussing UC self-surveys and other evidence on the importance of DEI Statements and their value in enforcing viewpoint uniformity).

just to start, all are statements that run directly contrary to the materials posted by the University for applicants.

95.     It is unlikely that the DEI Statement posted on Dr. Haltigan's Substack would receive better than a 1–2 on any category of the DEI Rubric. Many of the statements Dr. Haltigan makes in his DEI Statement are expressly rejected or treated scornfully in the materials linked on UC Santa Cruz's Academic Personnel Office website.

96.     His views on these issues are all protected by the First Amendment and have no bearing on his ability to perform the job in question.

97.     If Dr. Haltigan were to have applied for this position, or any others at UC Santa Cruz, he would be compelled to alter his behavior and either remain silent about the many important social issues addressed by the DEI Statement Requirement or recant his views to conform to the dictates of the University administration.

98.     The University's policy is that those with views like Dr. Haltigan on issues related to DEI will not be considered beyond an initial screening. This is unconstitutional.

### <u>First Claim for Relief:</u>

### <u>Violation of the First Amendment of the United States Constitution</u>

### <u>Unconstitutional Conditions</u>

99.     Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous paragraphs.

100.     Defendants are acting under the "color of state law" within the meaning of 42 U.S.C. § 1983 in imposing and enforcing a DEI Statement Requirement on all applicants for faculty positions.

101.     Defendants are denying a benefit to Plaintiff in a manner that infringes his First Amendment rights.

102.     Defendants are requiring Dr. Haltigan to express ideas with which he disagrees in order to be eligible for employment. This is an unconstitutional form of

compelled speech and is unconstitutional even when that requirement is tied to a government benefit to which the speaker is not entitled.

103.    The DEI Statement Requirement forces applicants to UC Santa Cruz to express agreement with the University's views on racism and social justice, and ultimately seeks to regulate speech outside the contours of the program.

104.    The DEI Statement Requirement unconstitutionally leverages the availability of a position at the University to force applicants to express agreement with the University's ideology.

105.    The DEI Statement Requirement places anyone with Dr. Haltigan's views who wants to work at the University of California in an untenable position. One can either file an honest, but doomed, application, or one can lie and recant his or her honest views. Silence and dissent are not options if he or she wants to progress past the initial screening.

106.    Because the DEI Statement Requirement requires Dr. Haltigan to affirm particular beliefs that are inherently separate from the qualifications for a position on the University's faculty or the purpose of the University as a whole, it imposes a condition on employment that would be unconstitutional if done outright.

## Second Claim for Relief:

## Violation of the First Amendment of the United States Constitution

## Viewpoint Discrimination

107.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous paragraphs.

108.    Defendants are acting under the "color of state law" within the meaning of 42 U.S.C. § 1983 in imposing and enforcing a DEI Statement Requirement on all applicants for faculty positions.

109.    The DEI Statement Requirement represents invidious viewpoint discrimination against any applicant holding views contrary to the detailed ideological standards set out in the DEI rubric and other guidance documents.

110.   The purpose of the DEI Statement Requirement is to penalize certain viewpoints and drive those viewpoints from the marketplace of academic hiring.

111.   Dr. Haltigan's views on colorblind inclusivity, viewpoint diversity, and merit-based promotion and hiring are all anathema to the University's express requirements in the DEI Statement.

112.   The DEI Statement Requirement has no relationship to established professional standards, the University's mission, or the qualifications for a position on the University's faculty.

113.   Because the DEI Statement Requirement is not tailored to any compelling interest, it is unconstitutional.

## **Request for Relief**

Plaintiff respectfully requests the following relief:

A. A declaration that the DEI Statement Requirement employed by UC Santa Cruz violates the First Amendment to the United States Constitution;

B. A permanent injunction forbidding UC Santa Cruz and University of California officials from enforcing, or attempting to enforce, the DEI Statement Requirement against Dr. Haltigan;

C. An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988;

D. Such other relief as this Court deems proper.

DATED: February 2, 2024.

Respectfully submitted,

JOSHUA P. THOMPSON
WILSON C. FREEMAN*
JACK E. BROWN*


By ___/s/ Wilson C. Freeman_____
    WILSON C. FREEMAN*
*Attorney for Plaintiff*
*\*pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

     I hereby certify that on February 2, 2024, Opposing Counsel received the foregoing Plaintiff's Second Amended Complaint via CM/ECF service.

By    /s/ Wilson C. Freeman
               WILSON C. FREEMAN*

*Attorney for Plaintiff*
*\*pro hac vice*

Second Am. Complaint
No. 5:23-cv-2437-NC

17