1
2
3
4
5

JOSHUA P. THOMPSON, No. 250955
Email: jthompson@pacificlegal.org
WILSON C. FREEMAN, Ariz. Bar. No. 036953*
Email: wfreeman@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

6
7
8
9

JACK E. BROWN, Va. Bar No. 94680*
Email: jbrown@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747

10
11

*Attorneys for Plaintiff*
*pro hac vice*

12

# UNITED STATES DISTRICT COURT

13

## NORTHERN DISTRICT OF CALIFORNIA

14

### SAN JOSE DIVISION

15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| JOHN D. HALTIGAN,<br><br>                                    Plaintiff,<br><br>          v.<br><br>MICHAEL V. DRAKE, in his official capacity as President of the University of California; CYNTHIA K. LARIVE, in her official capacity as Chancellor of UC Santa Cruz; BENJAMIN C. STORM, in his official capacity as Chair of the UC Santa Cruz Psychology Department; and KATHARYNE MITCHELL, in her official capacity as Dean of the UC Santa Cruz Division of Social Sciences,<br><br>                                    Defendants. | No. 5:23-cv-02437-EJD<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Edward J. Davila<br><br>Date: May 9, 2024<br>Time: 9:00 a.m.<br>Courtroom: 4 |

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION...............................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

LEGAL STANDARD ..........................................................................................................4

ARGUMENT .......................................................................................................................5

   I.    Dr. Haltigan has standing.........................................................................................5

      A.  Dr. Haltigan has a concrete and particularized injury because he wishes
          to compete and is ready and able to apply..........................................................6

      B.  Dr. Haltigan has alleged that the DEI Statement requirement causes his
          application to be placed at a disadvantage because of his views....................9

   II.    Dr. Haltigan has adequately alleged a viewpoint discrimination claim .......12

      A.  The Amended Complaint alleges sufficient facts to show that the DEI
          Statement policy is a political litmus test .........................................................14

      B.  The First Amendment has long prohibited universities from conditioning
          teaching jobs on adopting the university's political ideology........................16

      C.  Dr. Haltigan has adequately alleged that the DEI Statement policy
          causes him to suffer an adverse action ..............................................................20

   III.   *Pickering* balancing does not apply to Dr. Haltigan's unconstitutional
          conditions claim ......................................................................................................22

CONCLUSION..................................................................................................................24

CERTIFICATE OF SERVICE .........................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)...............................................................................9

*Agency for International Development v.*
  *Alliance for Open Society International, Inc.,*
  570 U.S. 205 (2013)........................................................................23–24

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)......................................................................... 5, 14

*Baggett v. Bullitt,*
  377 U.S. 360 (1964).............................................................................12

*Bd. of Cnty. Comm'rs, Wahaunsee Cnty. v. Umbehr,*
  518 U.S. 668 (1996).............................................................................23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................... *passim*

*Bras v. California Pub. Utilities Comm'n,*
  59 F.3d 869 (9th Cir. 1995)............................................................. 8, 12

*Carney v. Adams,*
  592 U.S. 53 (2020)...............................................................................6

*Demers v. Austin,*
  746 F.3d 402 (9th Cir. 2014)..........................................................17–19

*Doe v. Regents of Univ. of California,*
  23 F.4th 930 (9th Cir. 2022) ...............................................................12

*F.C.C. v. League of Women Voters of California,*
  468 U.S. 364 (1984).............................................................................23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
  528 U.S. 167 (2000)...............................................................................4

*Friery v. Los Angeles Unified Sch. Dist.,*
  448 F.3d 1146 (9th Cir. 2006)...........................................................7–8

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006).........................................................................17–18

*Grutter v. Bollinger,*
  539 U.S. 306 (2003).........................................................................12–13

*International Bhd. of Teamsters v. United States,*
  431 U.S. 324 (1977).............................................................................21

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
  385 U.S. 589 (1967)....................................................................... 12, 20

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)...............................................................................4

*Lutter v. JNESO,*
  86 F.4th 111 (3d Cir. 2023)............................................................4

*Madsen v. Boise State Univ.,*
  976 F.2d 1219 (9th Cir. 1992)......................................................8

*Malarkey v. Texaco, Inc.,*
  983 F.2d 1204 (2d Cir. 1993)......................................................21

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v.*
  *City of Jacksonville,*
  508 U.S. 656 (1993)............................................................6, 12

*NEA v. Finley,*
  524 U.S. 569 (1998)...............................................................20

*Olympus Spa v. Armstrong,*
  675 F. Supp. 3d 1168 (W.D. Wash. 2023) ......................................8

*Pickering v. Board of Education,*
  391 U.S. 563 (1968)........................................................*passim*

*Planned Parenthood of Greater Washington & N. Idaho v.*
  *U.S. Dep't of Health & Hum. Servs.,*
  946 F.3d 1100 (9th Cir. 2020)...........................................5, 8–9, 12

*Pro-Life Council, Inc. v. Getman,*
  328 F.3d 1088 (9th Cir. 2003)......................................................8

*Shackelford v. Deloitte & Touche, LLP,*
  190 F.3d 398 (5th Cir. 1999)......................................................21

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011)....................................................14

*Students for Fair Admissions, Inc. v.*
  *President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023)............................................................13, 19

*Terry v. A.C. Cook,*
  866 F.2d 373 (11th Cir.1989)....................................................21

*Texas v. Lesage,*
  528 U.S. 18 (1999)..................................................................9

*United States v. Students Challenging Regul. Agency Procs.,*
  412 U.S. 669 (1973)..................................................................6

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. &*
  *Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.,*
  602 F.3d 1087 (9th Cir. 2010)......................................................4

*Wetherbe v. Smith,*
  593 F. App'x 323 (5th Cir. 2014) ...............................................18

*Wilbur v. Locke,*
  423 F.3d 1101 (9th Cir. 2005), *abrogated on other grounds by*
  *Levin v. Com. Energy, Inc.,* 560 U.S. 413 (2010) .............................4

*Worrell v. Henry,*
  219 F.3d 1197 (10th Cir. 2000)..................................................18

**Constitution**

Cal. Const. art. I § 31(a)...................................................................................19

**Rule**

Fed. R. Civ. P. 12(b)(6) ....................................................................................4

**Other Authorities**

UCSC APO, Diversity Equity and Inclusion,
    https://apo.ucsc.edu/diversity.html .........................................................15

UCSC Starting Rubric to Assess Candidate Contributions to Diversity,
    Equity, and Inclusion,
    https://apo.ucsc.edu/docs/ucsc-rubrics-c2deistatements.pdf. ..................3, 11, 15

1

**INTRODUCTION**

2        Plaintiff Dr. John D. Haltigan is in an active search for an academic job. UC

3    Santa Cruz has a policy to screen candidates for academic jobs based on their views

4    on politically salient issues. This policy unconstitutionally places applicants with

5    certain views at a competitive disadvantage.

6        The University's Motion to Dismiss (MTD) here renews the two main

7    arguments they made in their previous motion. First, the University argues that Dr.

8    Haltigan lacks standing because Dr. Haltigan hasn't yet applied. Second, the

9    University argues that its application process should be immune from First

10    Amendment scrutiny. Both arguments fail.

11        First, Dr. Haltigan has standing because he is ready and able to apply and had

12    (at the time of filing) a real interest in an open position at the University. Dr.

13    Haltigan's injury is not the loss of the job, but the increase in competition because of

14    the unconstitutional burden. Dr. Haltigan was and is as ready and able to apply as

15    anyone could be. The only steps he has not taken are to attach his documents to an

16    online form and hit "submit." Dr. Haltigan's interest in the job is also very real. He

17    would apply—if not for the discriminatory DEI statement requirement which renders

18    an honest application at a mortal disadvantage.

19        Second, the University is wrong that its application process is immune to First

20    Amendment scrutiny. Under the University's argument, institutions ostensibly

21    committed to academic freedom would have constitutional carte blanche to impose

22    loyalty oaths and political litmus tests on incoming faculty. Nothing would prevent a

23    university in another state from requiring a "patriotism statement," or some other

24    politically charged questionnaire, as a condition of hiring. This is untenable—while

25    the University does have meaningful interests in hiring, those interests can be

26    incorporated and balanced under the framework articulated in *Pickering v. Board of*

27    *Education*, 391 U.S. 563 (1968).

28        Finally, the University's arguments throughout consistently fail to take Dr.

1    Haltigan's allegations of fact as true, which the court must on a motion to dismiss. Dr.

2    Haltigan need only allege facts sufficient to "raise a reasonable expectation that

3    discovery will reveal evidence" that plaintiffs are entitled to relief. *Bell Atl. Corp. v.*

4    *Twombly*, 550 U.S. 544, 556 (2007). From the University's mischaracterization of Dr.

5    Haltigan's interest in and ability to apply to the position, to the actual functioning of

6    the DEI Statement requirement, the University's MTD consistently tries to argue

7    about facts that are simply not in the complaint.

8        If Dr. Haltigan allegations are treated as true, he has alleged that the

9    University is using the DEI Statement requirement as a political litmus test. His

10   allegations state unequivocally that the University intends to screen candidates based

11   on their views on politically salient issues, and to ensure dissenting views are not

12   expressed in the application process. This policy not only discards good applications,

13   but it also serves to chill academics like Dr. Haltigan from even applying, by informing

14   them that an honest application will never get a fair shake.

15       Dr. Haltigan is entitled to a chance to prove his allegations. The MTD should

16   be denied.

17                        **FACTUAL BACKGROUND**

18       Dr. Haltigan has a PhD in developmental psychology and has previously

19   worked in several university positions. Second Amended Complaint (SAC) ¶ 7. He is

20   currently working as a part-time lecturer and is in an active hunt for an academic job.

21   SAC ¶¶ 59−67, 86. At the time he filed the complaint, UC Santa Cruz had an open

22   position in developmental psychology which was a close fit with Dr. Haltigan's

23   background and interests. SAC ¶¶ 68, 80, Ex. E. As explained in more detail below,

24   Dr. Haltigan was ready and able to apply at the time he learned about the position in

25   early 2023 but knew he could not compete because of the University's onerous DEI

26   Statement requirements. *See generally* SAC ¶¶ 58−78, 89−98.

27       UC Santa Cruz requires every candidate for every academic job opening to file

28   a DEI statement. SAC ¶ 81. The job opening states expressly that the initial screening

of candidates will be performed using only the DEI Statement and the research statement. SAC ¶ 82. Applicants understand, and the University wants them to understand, that the University uses the DEI Statement requirement to eliminate candidates from consideration without regard to their background, experience, or education. SAC ¶¶ 90−93.

UCSC's DEI Statement requirement does not ask applicants to discuss diversity or DEI in an open-ended fashion. Rather, the University dictates to candidates the necessary content of their statement. The University does this in three ways. First, UCSC provides official supporting documents on their DEI website, linked to in the job posting, defining the terms "diversity," "equity," and "inclusion" and instructing candidates that their application must also express and incorporate these definitions. SAC ¶¶ 37−41. Second, UCSC provides candidates and search committees with a detailed scoring rubric for DEI Statements. This rubric instructs candidates that they will be evaluated along several dimensions, but most importantly, on the extent of their "awareness" or "knowledge" and willingness to advance the DEI orthodoxy the University has articulated. SAC ¶¶ 42−46. *See also* UCSC Starting Rubric to Assess Candidate Contributions to Diversity, Equity, and Inclusion, https://apo.ucsc.edu/docs/ucsc-rubrics-c2deistatements.pdf. Third, UCSC provides candidates with ancillary material on DEI which they must consider if they wish to be competitive, through sources like the Psychology Department webpage or the Academic Personnel Office "DEI Resources" page. SAC ¶¶ 50−54.

This required content, in conjunction with the initial screening on applicants, transforms the DEI Statement requirement into something unique. The purpose and effect of the DEI Statement requirement at UCSC is to inform applicants that if they want to be considered for a job at the University, they must affirm the University's political ideology on particular issues.

Dr. Haltigan correctly understands that this requirement puts any application he would make to UCSC at a fatal disadvantage. So even though he was ready and

able to apply in Spring 2023, and although there was an open position which was a fit with his background, and he applied to other schools in the area on several occasions that year, he chose to bring this lawsuit rather than face an unfair choice between dishonesty, recantation, or humiliating rejection. Meanwhile, the University has continued to impose this requirement on all job applicants, including in new positions in psychology which Dr. Haltigan is qualified for. SAC ¶¶ 86–88.

## LEGAL STANDARD

Under Article III, federal courts can only consider cases or controversies. To satisfy Article III's standing requirements, a plaintiff must show that it has suffered an (1) injury in fact, that is concrete, particularized, and not "conjectural or hypothetical"; (2) that this injury is "fairly traceable to the challenged action"; and (3) that the injury is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Standing is assessed at the "outset of the litigation." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005), *abrogated on other grounds by Levin v. Com. Energy, Inc.*, 560 U.S. 413 (2010) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint."). "[P]ost-filing developments do not defeat jurisdiction if jurisdiction was properly invoked as of the time of filing." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1091–92 (9th Cir. 2010). The relevant time of filing for this purpose is the time of the original complaint, not the amended complaint. *See Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023) ("An amended complaint—while the operative pleading for purposes of evaluating the sufficiency of the allegations, the viability of the claims, and the requested relief—does not restart the date for assessing standing.").

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts must take all facts in the complaint as true, make all reasonable inferences in favor of the plaintiffs, and

determine whether the complaint states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* There is no "probability requirement" at the pleading stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556. Instead, plaintiffs must allege facts sufficient to "raise a reasonable expectation that discovery will reveal evidence" that plaintiffs are entitled to relief. *Id.* A well-pleaded complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (cleaned up).

## ARGUMENT

### I.   Dr. Haltigan has standing

In the decision on the Defendants' first motion to dismiss, this Court acknowledged that "a plaintiff may challenge a selection process without having applied so long as the plaintiff demonstrate[s] that it is able and ready to" apply. *See* ECF No. 37 at 5 (cleaned up) (citing *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020)). However, this Court found the First Amended Complaint deficient because it failed to adequately allege specific facts relating to his own "ability and readiness." *Id.*

The SAC adds details on Dr. Haltigan's readiness and ability to apply for an open position at UCSC that existed at the time he filed his complaint. Because standing must be assessed as of this date, the fact that the job Dr. Haltigan was interested in is no longer available is irrelevant for purposes of standing. The SAC also fleshes out the extent to which the DEI Statement requirement, as alleged, undermines his ability to compete for any position at UCSC, and in fact, renders any application futile.

Because Dr. Haltigan was ready and able to apply, and because the unconstitutional DEI Statement requirement puts any application at a disadvantage, he has a concrete injury, readily traceable to the University's policy. *See Planned*

1  *Parenthood*, 946 F.3d at 1108 ("Causation and redressability are generally implicit in

2  injury-in-fact under the competitor standing doctrine.") (citing *Ne. Fla. Chapter of*

3  *Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 n.5

4  (1993)).

5         **A.    Dr. Haltigan has a concrete and particularized injury because he**

6                **wishes to compete and is ready and able to apply**

7         Dr. Haltigan's application to UCSC was effectively ready to go at the time of

8  filing. All the materials he needed to apply were prepared. The job was open, and he

9  could have applied at that time. The only barrier was the unconstitutional DEI

10 Statement requirement. This is enough of an interest to amount to standing. *See*

11 *United States v. Students Challenging Regul. Agency Procs.* (*SCRAP*), 412 U.S. 669,

12 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing to fight out a question

13 of principle; the trifle is the basis for standing and the principle supplies the

14 motivation.").

15        The Court's decision first expressed concern whether Dr. Haltigan had alleged

16 enough to show he was "able and ready" to apply. *See* ECF No. 37 at 7−8 (discussing

17 the need for plaintiff to allege "preparatory steps" to an application) (quoting *Carney*

18 *v. Adams*, 592 U.S. 53, 63 (2020) (finding plaintiff lacked competitor standing "without

19 reference to an anticipated timeframe, without prior judgeship applications, without

20 prior relevant conversations, without efforts to determine likely openings, without

21 other preparations")). Applications to UCSC require several elements: a cover letter,

22 an updated C.V., a research statement, a diversity statement, a teaching statement,

23 and 2−5 reprints or preprints of published work. SAC Exhibit G. Dr. Haltigan had all

24 these materials prepared and ready to go at the time of filing; indeed, he keeps these

25 materials ready and submitted them to several other positions. SAC ¶¶ 61−73;

26 Exhibits A−F. All of these materials could have been submitted with no substantive

27 changes on the UCSC portal linked to in the job posting. SAC Exhibit G at 3−4. This

28 shows that, preparation-wise, Dr. Haltigan was as ready-and-able as anyone could

1    possibly be to apply for the position in question.

2         This Court's opinion on the previous motion to dismiss also expressed concern

3    about Dr. Haltigan's interest in the job. *See* ECF No. 37 at 6–7 (discussing the

4    sufficiency of a mere "statement of intent"). The SAC also makes clear that Dr.

5    Haltigan's interest in this job was also more than merely hypothetical. Dr. Haltigan's

6    job search is directed toward places he wants to live and work with openings that fit

7    his background and interests. SAC ¶ 60. The UCSC opening in developmental

8    psychology fit both requirements. First, Dr. Haltigan wants to live and work in

9    California, which is attested to by the fact that he applied to multiple openings in the

10   state in 2023. SAC ¶ 64. Second, Dr. Haltigan's research interests—including "the

11   legacy of early caregiving experiences," "life history," and "measurement and

12   classification of child and adolescent psychopathology" all dovetail with UCSC's

13   search for a professor "whose research addresses the intersection of developmental

14   psychology …. with a focus on the well-being of children and youth in their families,

15   peer relations, schools, and/or cultural communities." SAC Exhibit G. Finally, Dr.

16   Haltigan alleges that he expects the University to continue to post positions he is

17   interested in and qualified for, such as the quantitative psychology position which is

18   currently available. *See* SAC ¶¶ 84–88; Exhibit H.[1]

19        These allegations clearly go well beyond a mere statement of intent and contain

20   the sort of real, concrete facts which support both the intent and ability. Dr. Haltigan's

21   allegations about his own readiness must be taken as true for purposes of the motion

22   to dismiss.

23        The University's primary arguments throughout their motion ignore

24   competitor standing. Instead, the University argues that cases like *Friery* preclude

25   _____

26   [1] The University asserts, without evidence, that Dr. Haltigan is not qualified for this
     position. MTD at 13. But Dr. Haltigan is currently teaching undergraduate statistics
27   and the position asks only for a candidate with "expertise in quantitative methods and
     demonstrated excellence in teaching statistics." SAC Ex. H. Dr. Haltigan meets this
28   minimum qualification. SAC ¶¶ 84–88.

standing because Dr. Haltigan did not apply for the position. MTD at 8–12 (citing *Friery v. Los Angeles Unified Sch. Dist.*, 448 F.3d 1146, 1149 (9th Cir. 2006)). But *Friery* involved neither competitor standing nor the First Amendment.[2] *Id.* at 1149–50. There, an application by the plaintiff would have resolved numerous ambiguities and simplified the case. *Id.* (questioning whether the representations given to the plaintiff were accurate or whether exceptions might have applied which would have resolved the dispute) (citing *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1221 (9th Cir. 1992) (no case or controversy because court was uncertain whether "claim that he was entitled to a free permit to park in any handicap space on campus or that there should have been some handicap spaces accessible with a special, no-fee permit")).

But under competitor standing, courts are unanimous that Dr. Haltigan need not apply for this Court to have jurisdiction. *See Planned Parenthood*, 946 F.3d at 1108 ("A plaintiff need not participate in the competition … only demonstrate that it is able and ready to bid.") (cleaned up). *See also Bras v. California Pub. Utilities Comm'n*, 59 F.3d 869, 873–74 (9th Cir. 1995) (plaintiff who challenged MBE preference program had standing to challenge program based on evidence he had provided services for 20 years, was able and ready to continue providing services, but was disadvantaged by program). Indeed, where the injury is the denial of the ability to compete fairly, rather than the denial of the benefit, suing preemptively is typically

---

[2] Although the Court's decision called the application of First Amendment standing principles to this case "tenuous," the Court focused on prudential standing questions rather than on how the University's policy threatens Dr. Haltigan's free speech and academic freedom rights by compelling him to file a statement he disagrees with. *See Olympus Spa v. Armstrong*, 675 F. Supp. 3d 1168, 1190 (W.D. Wash. 2023) (in finding standing to bring compelled speech claim, observing that "the inquiry tilts dramatically toward a finding of standing" whenever the First Amendment is implicated) (citing *Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("Particularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements.")). Plaintiff preserves this argument: requiring him to apply subjects him to an unconstitutional infringement on his First Amendment right to be free from compelled speech.

1   the only way to obtain effective relief. Accordingly, courts have never required
2   competitors to show that they can effectively win a competition in order to establish
3   competitor standing; only that they are being denied the right to compete on equal
4   terms. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("We
5   note that, contrary to respondents' suggestion … Adarand need not demonstrate that
6   it has been, or will be, the low bidder on a Government contract."). An application in
7   such a case does not simplify the case or answer any unanswered questions: if the
8   plaintiff is ready and able to apply, and the barrier disadvantages him, the court is
9   presented with a justiciable controversy. Forcing the plaintiff to file a retrospective
10  suit based on the denial of the benefit might only make judicial resolution functionally
11  impossible.[3] *See Planned Parenthood*, 946 F.3d at 1109 ("If Planned Parenthood did
12  not have standing, then the instant agency action would be insulated from judicial
13  review.").

14      This Court should conclude that Dr. Haltigan's allegations are sufficient to
15  show that he was ready and able to apply for an open position at the time he filed his
16  complaint. This fact alone is sufficient to create a case or controversy.

17      **B.   Dr. Haltigan has alleged that the DEI Statement requirement**
18          **causes his application to be placed at a disadvantage because of**
19          **his views**

20      The University's only real argument which addresses competitor standing is
21  that Dr. Haltigan failed to allege a "concrete" disadvantage from the DEI Statement
22  requirement. MTD at 9–11. This argument rests on a stark mischaracterization of the

23

---

24  [3] Here, if Dr. Haltigan were to have applied and been denied the job because of the
25  DEI Statement policy, his lawsuit would face innumerable obstacles which would
    distract from the DEI Statement policy, including immunity doctrines and the
26  University's likely argument that he would not have won the competition for the job
    in any case. *See Texas v. Lesage*, 528 U.S. 18, 21 (1999) (observing that government
27  can avoid liability in discrimination case by proving that it would have made the same
    decision without the impermissible motive). Preemptive litigation is the only way to
28  adjudicate the legality of the DEI Statement Requirement.

allegations in the SAC.

As Dr. Haltigan's complaint states, the diversity statement requirement used by UCSC is not an open-ended, "subjective" inquiry—it is a test, and a test where applicants are given the answers ahead of time. A job application is a competitive process, and an applicant who is unwilling to adopt those answers as their own is at a severe disadvantage. Accordingly, Dr. Haltigan knew at the time he filed the complaint that no honest DEI Statement he could have made would have enabled him to effectively compete for the position. SAC ¶¶ 89−90. In fact, this is the purpose of the DEI Statement requirement—to exclude people with certain views, for the purpose of advancing the University's goal of ideological conformity around racial, ethnic, and gender balancing. SAC ¶¶ 16−35, 92.

The University first tells applicants the answers to the test by providing detailed definitions and viewpoints that they should incorporate into their diversity statements. Official supporting documents on the University's DEI website, linked to in the job posting, define debatable terms like "diversity," "equity," and "inclusion." SAC ¶¶ 37−41. In addition, the University provides numerous supporting documents discussing DEI in detail, including on its Academic Personnel Office website. One document, a list of "common myths" about DEI in faculty recruitment, states that the University is committed to race-conscious hiring and that opinions and debate on this question are unwelcome. SAC ¶¶ 48−49. Similarly, the webpage for the Psychology Department lists "DEI Resources" and stresses the importance of race-conscious decision-making and the importance of race and gender balancing in strident terms, embracing a host of controversial political perspectives. SAC ¶¶ 50−52. The complaint alleges that the purpose of these pages is to tell applicants what views are acceptable, and which statements—when made in a job application—will disqualify them from consideration. SAC ¶ 53.

The University then evaluates diversity statements for their compliance with this orthodoxy. This evaluation primarily takes place through the use of the DEI

Statement rubric, but also through communication of these same materials to the faculty charged with hiring. The rubric explicitly evaluates DEI Statements based, in part, on their "knowledge"—in other words, their knowledge of and acceptance of the concepts embedded in the University's supporting materials. SAC ¶¶ 44−46. But beyond explicitly asking candidates to demonstrate their knowledge of the University's dogma, the components of the rubric focused on plans and activities looking for proxies for these beliefs, such as participation in conferences designed to "increase understanding" of DEI, or intention to be an "advocate" for DEI (with these terms understood in precisely the way the University defines them). *See* UCSC Starting Rubric, *supra*.

There is no question that this practice places Dr. Haltigan at an "unambiguous" and "concrete" disadvantage. The sample DEI Statement which Dr. Haltigan put on his blog states that he is "committed to colorblind inclusivity, viewpoint diversity, merit-based evaluation, and value outreach to underrepresented groups in higher education." SAC Exhibit F. It also states his beliefs that "what is meant by 'equity' is inconsistent with the principle of 'equal opportunity'," and that "disparities in outcome are [wrongly] ipso facto taken as indicating social oppression or injustice." *Id.* Dr. Haltigan's sample diversity statement also specifically rejects the usefulness of the concept of "intersectionality" (or "dimensions of diversity," in the terminology of the rubric) and calls out strong disagreement with authors like Ibram Kendi, who is favorably cited throughout the guidance materials provided by the University. SAC Exhibit F. Given his statements, it is no surprise his statement does not demonstrate any knowledge of the importance of "dimensions of diversity," or "understanding of demographic data," or an intent to be a "strong advocate for" DEI. *See* UCSC Starting Rubric, *supra*.

Given these stated views, no honest statement from Dr. Haltigan could fail to put him at a disadvantage. Furthermore, Dr. Haltigan had every reason to believe that his application was not only disadvantaged, but utterly futile. At one of UCSC's

sister schools, which uses the same DEI Statement rubric as UCSC, a study revealed that 76% of applicants were eliminated on the basis of their diversity statements alone. SAC ¶ 91. Dr. Haltigan, given his strong disagreement with the very fundamental principles of DEI, and the stated importance and emphasis placed on DEI Statements by the University, correctly believed he could not be seriously considered by the University. SAC ¶¶ 95–97.

For purposes of competitor standing, Dr. Haltigan need only show that the unconstitutional condition leads to an "increase in competition" or the "denial of equal treatment." *See, e.g.*, *Jacksonville*, 508 U.S. at 666; *Planned Parenthood*, 946 F.3d at 1108; *Bras*, 59 F.3d at 873. Dr. Haltigan's allegations unequivocally meet this standard. Furthermore, the inference that Dr. Haltigan's application would be futile given the stark differences between his DEI statement and the materials and guidance offered by the University is one the Court must accept at this stage of the litigation. *See Doe v. Regents of Univ. of California*, 23 F.4th 930, 935 (9th Cir. 2022) (observing that plaintiff cannot know full extent of discrimination before discovery; patterns or statements of bias can give rise to plausible inference sufficient to survive motion to dismiss).

## II. Dr. Haltigan has adequately alleged a viewpoint discrimination claim

UC Santa Cruz's DEI Statement policy violates the First Amendment by casting a "pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). The First Amendment strongly protects academic freedom, i.e., the freedom for teachers and students at universities to think, write, and speak. *Id*; *Baggett v. Bullitt*, 377 U.S. 360 (1964). The Supreme Court has repeatedly reaffirmed that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603. This is because the "classroom is peculiarly the 'marketplace of ideas'" and "any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our nation." *Id.*

1   (quotations omitted) (cleaned up). *See also Grutter v. Bollinger*, 539 U.S. 306, 329

2   (2003) (observing that universities occupy "special niche" in constitutional tradition).

3       Despite this precedent, the University argues that its DEI Statement policy

4   does not even involve any First Amendment interests because it relates only to the

5   University's operations, and the University is entitled to ensure job applicants can do

6   the job they are hired for. This argument has two major problems.

7       First, the University's description of the DEI Statement requirement is in direct

8   opposition to Plaintiff's allegations. The University describes the DEI Statement

9   requirement as regulating of "DEI related activities," and talks about the importance

10  of "DEI-related issues" at the University. MTD at 17, 23. These terms do not appear

11  in the complaint, which is not nearly so general. Instead, the complaint describes the

12  DEI Statement policy as a political litmus test, which is designed to filter and screen

13  out ideologically unwelcome applicants on specific issues related to race, gender, and

14  ethnic balancing. SAC ¶¶ 30–34, 53–57, 91–98. The University may contest this

15  characterization of their requirement—but at the motion to dismiss stage, the only

16  question for the court is whether the alleged facts are sufficient to "raise a reasonable

17  expectation that discovery will reveal evidence" that plaintiffs are entitled to relief.

18  *Twombly*, 550 U.S. at 556. Understood this way, there is no question that the First

19  Amendment must apply to the University's program.

20      The second problem is that there is no limiting principle to the University's

21  argument—the University's argument would place its job application process outside

22  the scope of the First Amendment. This would do tremendous damage to academic

23  freedom and the "special niche" it holds in our constitutional tradition. *Bollinger*, 539

24  U.S. at 329. It would allow universities to accomplish indirectly what cannot be done

25  directly. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,

26  600 U.S. 181, 230 (2023). To avoid this outcome, the First Amendment must apply to

27  these sort of litmus tests in academic hiring.

28      Since the First Amendment must apply to the DEI Statement policy, *Pickering*

1   balancing applies. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391

2   U.S. 563, 568 (1968). That flexible test gives the University plenty of room to protect

3   its legitimate interests in job applications but does not allow it to flagrantly

4   discriminate based on viewpoint, as it is doing here.

5       **A.    The Amended Complaint alleges sufficient facts to show that the**

6           **DEI Statement policy is a political litmus test**

7       The University seeks to characterize the DEI Statement policy as an innocuous

8   requirement, which merely evaluates applicants' ability to perform their "official

9   duties." MTD at 14–18. For example, according to the University, the DEI Statement

10  requirement ensures that faculty should be "aware of and sensitive to how a wide

11  range of personal experiences might inform a student's 'unique ability to contribute'

12  to their field." MTD at 18. Accordingly, they argue it should be entirely outside the

13  scope of First Amendment protection.

14      This characterization of the DEI policy ignores Dr. Haltigan's actual

15  allegations. Even if this Court thinks Dr. Haltigan's claims "improbable," Dr. Haltigan

16  is entitled to a chance to prove his case. His allegations need only be detailed enough

17  to "give fair notice" and to set the stage for discovery, to learn more about the

18  underlying facts. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Furthermore, the

19  Plaintiff is entitled to "reasonable inference[s]." *Iqbal*, 556 U.S. at 663. Here, Dr.

20  Haltigan's complaint makes a series of factual allegations, which, accepted as true,

21  show that the University's DEI Statement policy is a political litmus test deployed for

22  the purpose—and having the effect of—excluding people with contrary views on a

23  range of issues, particularly with respect to race, ethnicity, gender, and merit.

24      The complaint begins by telling the origin story of DEI Statement policy in the

25  University of California. As the complaint explains, early DEI Statement

26  requirements were employed very differently, and over time, faculty began to come

27  under pressure to use DEI Statements to pursue ideological conformity around a

28  vision of diversity focused on racial, ethnic, and gender balancing. SAC ¶¶ 15–16. This

pressure was driven by directives from the state legislature and university administration to increase the proportion of underrepresented minorities in faculty and to ensure ideological conformity around that goal. SAC ¶¶ 17−32. The highly prescriptive DEI Statement policy in place today is a product of these pressures, and the University regards strong DEI statement uniformity and enforcement as an important tool. SAC ¶¶ 34−36.

Next, Dr. Haltigan's complaint specifically alleges a series of specific facts supporting the allegation that the DEI Statement is used to "pursue ideological conformity and a vision of diversity focused on racial, ethnic, and gender balancing." SAC ¶ 16. For example, Dr. Haltigan alleges that UCSC "defines the terms 'diversity,' 'equity,' and 'inclusion' in a specific manner that ensures successful applicants adhere to a particular ideology and worldview." SAC ¶ 38. These definitions are unique to the University's ideological vision. For instance, UCSC defines diversity specifically to emphasize advancing "groups that have traditionally been underrepresented in top tier research institutions, including women and certain minority groups" rather than other types of diversity that might conflict with this vision. SAC ¶ 37 (citing UCSC APO, Diversity Equity and Inclusion, https://apo.ucsc.edu/diversity.html). Then, as UCSC itself explains, these definitions are a component of the "knowledge" and "experience" the University wants candidates to articulate in their DEI Statements. SAC ¶ 40 (citing UCSC APO, Diversity Equity and Inclusion, *supra*).

Dr. Haltigan's complaint also details that UC Santa Cruz's website discloses a scoring rubric where "an applicant must express agreement with specific sociopolitical ideas, including the view that treating individuals differently based on their race or sex is desirable" to receive a high score. SAC ¶ 43. And the complaint alleges that "[u]nder the rubric, low scores are specifically promised for applicants that believe race and sex should not be used to judge individuals." SAC ¶ 46. Indeed, in one example, the rubric itself states that a score of 1−2 is appropriate for an individual expressing the viewpoint that it's "better not to have outreach or affinity groups aimed

at underrepresented individuals." UCSC Starting Rubric, *supra*. The rubric even goes so far as to assign a low score for advancing a different definition of diversity, or for "discounting the importance" of diversity (as the University defines it). *See id.* The rubric as a whole is designed to filter on a particular set of views that the University wants to discriminate against. This is especially apparent when the rubric is considered alongside the supporting documents the University provides to candidates, detailed in the complaint at SAC ¶¶ 47–53. Reviewing all these documents together, it is more than a reasonable inference that the University discriminates against applicants who, like Dr. Haltigan, hold a skeptical view of DEI. SAC ¶¶ 97–98.

These are not legal conclusions—they are allegations of facts, which, taken as true, paint a picture of the DEI Statement requirement. Far from being, as the University says, "plainly part of UC Santa Cruz's efforts to evaluate applicants' ability to perform their official duties," MTD at 17, the "the guidelines, rubrics, and reference materials are intended to require applicants to repeatedly attest to particular beliefs to be considered for a position." SAC ¶ 53. As a whole, these materials work together to dictate particular responses and filter unwelcome views. This is how an ordinary applicant would understand the University's collective application documents, and indeed, how applicants are intended to understand these materials. SAC ¶ 57.

**B.  The First Amendment has long prohibited universities from conditioning teaching jobs on adopting the university's political ideology**

In the face of these factual allegations, the University nonetheless argues that the DEI Statement requirement should be completely immune from First Amendment scrutiny. According to the University, its interests in ensuring that applicants "will perform job duties" requires that the Court conclude that statements in job applications are categorically outside the scope of the First Amendment. MTD at 24. However, the University ignores the long history of the Supreme Court employing a careful eye to ensure that public academic institutions do not leverage jobs to coerce

1    particular views or compel speech. That is precisely what is occurring here.

2         In *Pickering*, a public-school teacher wrote a letter to a local newspaper

3    criticizing the school board and superintendent. 391 U.S. at 564. The school district

4    terminated the teacher, claiming that the letter "was 'detrimental to the efficient

5    operation and administration of the schools of the district.'" *Id.* at 564. The teacher

6    sued on First Amendment grounds. The Court held that teachers cannot be "compelled

7    to relinquish the First Amendment rights" to "comment on matters of public interest

8    in connection with the operation of the public schools in which they work." *Id.* at 568.

9    Accordingly, *Pickering* requires courts to balance "the interests of the teacher, as a

10   citizen, in commenting upon matters of public concern and the interest of the State,

11   as an employer, in promoting the efficiency of the public services it performs through

12   its employees." *Id.* at 568.

13        *Garcetti v. Ceballos* did not change this overarching rule. 547 U.S. 410 (2006).

14   In *Garcetti*, a deputy district attorney was subject to adverse employment actions for

15   his statements at work about a purely case-related matter, pursuant to his duties as

16   a prosecutor. The Court held that speech of this type—purely pursuant to official

17   duties—is not insulated from employer discipline by the First Amendment. *Id.* at

18   421−22. But the Court did not overturn *Pickering* or decide that government

19   employees surrendered their free speech rights. Rather, the Court was clear that

20   "[t]he First Amendment limits the ability of a public employer to leverage the

21   employment relationship to restrict, incidentally or intentionally, the liberties

22   employees enjoy in their capacities as private citizens." *Id.* at 419. The Court was also

23   clear that the proper inquiry as to whether the First Amendment applies is "practical";

24   for example, the Court rejected the idea that an employer can restrict employee rights

25   by unilaterally asserting broad job descriptions. *Id.* at 424−25. Finally, the Court

26   expressly reserved how this framework might interact with academic freedom and

27   acknowledged the "additional constitutional interests" implicated in that context. *Id.*

28   at 425.

Following *Garcetti*'s express carve out of academic speech, the Ninth Circuit has carefully limited *Garcetti* and stated unequivocally that it does not apply to "[s]peech related to scholarship or teaching." *Demers v. Austin*, 746 F.3d 402, 414 (9th Cir. 2014). In *Demers*, the court considered whether a 7-step reorganization plan sent to the provost and the president by an associate professor who was a member of the Structure Committee and the Mass Communication Committee was protected by the First Amendment. The court first determined that this speech was pursuant to his official duties as member of those committees, and so within the scope of *Garcetti*. *Id.* at 410. However, the court held that the Plan was "related to" scholarship and carved out a broad exception to *Garcetti* for all such speech. *Id.* at 411. Accordingly, the court in *Demers* concluded that the *Pickering* balancing test had to apply.

Following the logic of these cases, the University's argument that its demanding DEI Statement policy should be outside the scope of the First Amendment must fail, either because the demanded statements are outside the official duties, or, if they are within the official duties, because they encroach on "scholarship or teaching."

First, if the DEI statement requirement is understood as a political litmus test, it cannot be considered even remotely analogous to the "official duties" speech at issue in *Garcetti*. Indeed, there is a significant difference between what the DEI Statement requires of candidates and the sort of job application speech that courts have upheld in the cases cited by Defendants. For example, in *Wetherbe*, an unreported Fifth Circuit case the Defendants cite multiple times, the court merely concluded that interview speech should not be "categorically" understood as protected. *Wetherbe v. Smith*, 593 F. App'x 323, 328–29 (5th Cir. 2014). And the speech in question was about tenure and other "application-related" issues—plainly much more related to the job than the DEI Statement is alleged to be here. *Id. See also Worrell v. Henry*, 219 F.3d 1197, 1207 (10th Cir. 2000) (applying *Pickering* balancing to hiring decisions, concluding balancing in government's favor because speech could have harmed

1  cohesiveness in law enforcement).

2       Unlike *Wetherbe*'s discussion of tenure and hiring, it is difficult to understand

3  how the University could believe that a professor's "official duties" include activities

4  like "express[ing] agreement with specific sociopolitical ideas, including the view that

5  treating individuals differently based on their race or sex is desirable." SAC ¶ 43. This

6  is especially so since treating students differently based on their race or sex is patently

7  unconstitutional under both the United States and California constitutions. *See*

8  *Students for Fair Admissions*, 600 U.S. at 223 ("[T]he Government must treat citizens

9  as individuals, not as simply components of a racial, religious, sexual or national

10  class."); Cal. Const. art. I § 31(a) ("The State shall not discriminate against, or grant

11  preferential treatment to, any individual or group on the basis of race, sex, color,

12  ethnicity, or national origin in the operation of public employment, public education,

13  or public contracting."). As the U.S. Supreme Court explained this summer,

14  "[u]niversities may define their missions as they see fit," but those missions must

15  comply with the Constitution and may not license classifying students by race for the

16  sake of diversity. *Students for Fair Admissions*, 600 U.S. at 217.

17       But even if the DEI Statement was somehow testing Dr. Haltigan's ability to

18  do the job, the issues it touches on are too sensitive and intimately bound up with

19  teaching and academic writing, especially in the social sciences, to fall outside First

20  Amendment scrutiny. In *Demers*, the Ninth Circuit concluded that a pamphlet

21  expounding on university structure and organization "related to" scholarship

22  sufficiently to be protected by the First Amendment. 746 F.3d at 415. The court

23  explained in that case that "protected academic writing is not confined to scholarship."

24  *Id.* at 416. Much academic writing is, of course, scholarship. But academics, professors

25  in the "course of their academic duties, also write memoranda, reports, and other

26  documents addressed to such things as a budget, curriculum, departmental structure,

27  and faculty hiring." *Id.* at 416. The Ninth Circuit accordingly concluded that

28  "[d]epending on its scope and character, such writing may well address matters of

public concern under *Pickering*." *Id.* The same is true of a statement filed alongside a job application. Here, the University is probing social science candidates on their views on issues like race, merit, gender, and the demographic and socioeconomic factors behind advancement. These issues almost intrinsically involve matters of relevance to academic work. Indeed, Dr. Haltigan alleges that the very purpose of this policy is to influence teaching and writing on a matter of public concern. SAC ¶ 53–57.

The academic freedom discussed in *Keyishian* will not survive if university administrators can dictate orthodox answers to disputed questions in hiring announcements without any constitutional guardrails. *See Keyishian*, 385 U.S. at 603 (discussing the importance of the "marketplace of ideas" and the need to eschew "authoritative selection"). Universities cannot have such unfettered discretion to engage in deliberate viewpoint discrimination in job applications. *NEA v. Finley*, 524 U.S. 569, 586–87 (1998) (government may not "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints"). The University has interests in hiring, of course, but the correct way to incorporate the University's interests is to apply the balancing test the Supreme Court articulated in *Pickering*. Under that balancing test, Dr. Haltigan has stated a claim for relief.

## C.   Dr. Haltigan has adequately alleged that the DEI Statement policy causes him to suffer an adverse action

The Defendants' remaining arguments—that Dr. Haltigan has failed to adequately allege an adverse effect or that he has failed to allege a causal connection— both fail for many of the same reasons discussed in the standing section. In particular, the injury Dr. Haltigan is seeking to remedy is unfair treatment in the application *process*, rather than being denied employment at the University. SAC ¶¶ 99–106. But in addition, the University's arguments rest on disputes over the fundamental facts which are inappropriate to resolve at this stage of the litigation. *See Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable.").

The University first argues that Dr. Haltigan has failed to allege that the policy would impact him because he failed to apply, so it's impossible to know if he would have gotten the job or not. But this is not the standard; Dr. Haltigan is not seeking to be appointed to a position at the University or compensated for the denial of his application. Rather, Dr. Haltigan is seeking prospective relief in the form of fair treatment in the application process. Right now, the University screens all applicants on the basis of the DEI Statement.[4] SAC ¶¶ 31–33, 93. The "adverse action" in this case is the disadvantaged treatment his application would receive at the screening stage because of his views. Dr. Haltigan has certainly alleged sufficient facts to show that such an injury is imminent. *See supra* I.B.

However, even if the adverse action was the denial of his job application as a whole, numerous courts have concluded that plaintiffs alleging discrimination or retaliation do not have to apply to show adverse action if the application would have been futile. *See, e.g.*, *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406 (5th Cir. 1999) (claim of futility depends on showing "known and consistently enforced" policy); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993) ("[T]he rule is that a plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor.") (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 364–67 (1977)); *Terry v. A.C. Cook*, 866 F.2d 373, 378–79 (11th Cir.1989) (in civil rights claim, "[c]ourts have long recognized circumstances in which a failure to apply may be overcome by facts which demonstrate the futility of such application").

---

[4] The formal inclusion of the research statement in this screening process does not change Dr. Haltigan's allegation that the screening is conducted primarily on the basis of the DEI Statement. SAC ¶¶ 93–98. The University's suggestion that a research statement of sufficient quality could overcome a poor DEI Statement is directly in opposition to Dr. Haltigan's complaint. SAC ¶¶ 53–57, 92–98. These factual allegations and inferences are supported by numerous allegations in the complaint on the importance and effectiveness of DEI statements to the University. SAC ¶¶ 22–35, 89–92.

The terms of the DEI Statement policy are stated publicly, repeatedly, and in tones that brook no dissent. Dr. Haltigan has every reason to believe these policies are consistently enforced. In fact, Dr. Haltigan alleges that excluding people like him from competing for the job is the purpose of the policy. SAC ¶¶ 56−57. These are factual allegations—the plaintiff is entitled to a chance to prove them even if a court is "doubtful." *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)").

Second, the University argues that Dr. Haltigan has failed to allege that his views would be a motivating factor behind the denial of his application. These arguments once again miss that Dr. Haltigan is not seeking to establish that he should be appointed to the job in question, rather, he is only seeking to have his application considered without regard for the DEI Statement requirement. With respect to that injury, Dr. Haltigan has alleged the necessary causal connection to his speech. His SAC alleges in detail that the DEI rubric and other materials and directives promulgated by the University combine to render his application futile, and without considering the vast bulk of his qualifications. SAC ¶¶ 89−98. The University may disagree whether Dr. Haltigan, and others with similar views, are given a fair shake under the DEI Statement policy. But this is a factual dispute, and not appropriate to resolve before discovery.

The University does not assert that Dr. Haltigan's complaint is deficient on the remaining *Pickering* factors. *See* MTD at 14−15. But even at this early stage, given the Supreme Court's decision in *Students for Fair Admissions*, the University's interest in promulgating an ideology of race preferences directly contrary to the Constitution cannot possibly outweigh Dr. Haltigan's interest in freedom of expression. His viewpoint discrimination claim should go forward.

### III. *Pickering* balancing does not apply to Dr. Haltigan's unconstitutional conditions claim

Even if Dr. Haltigan's viewpoint discrimination claim cannot proceed, he has

adequately pled that the DEI Statement imposes an unconstitutional condition on a government benefit. The University misunderstands the fundamental aspects of this cause of action.

Under the unconstitutional conditions doctrine, the government may not condition the receipt of government benefits on an agreement to surrender one's constitutional rights. The doctrine "holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs, Wahaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996). For example, in *Agency for International Development v. Alliance for Open Society International, Inc.* (*AOSI*), the Court struck down a statutory requirement that NGOs seeking funding to fight HIV/AIDS have a policy "explicitly opposing prostitution and sex trafficking." 570 U.S. 205, 210 (2013). The Court observed that Congress generally has the authority to impose limits on the use of funds provided via a government program, but that there is a key distinction "between conditions that define the limits of the government spending program— those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15. Congress had adopted the requirement to eradicate prostitution and sex trafficking, and to force grant recipients to adopt a similar stance. *Id.* at 218. By forcing organizations to "pledge allegiance" to this principle and espouse the view of the government, the policy violated the unconstitutional conditions doctrine. *Id.* at 218–219. *See also F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 400 (1984) (editorializing ban for public broadcasters left no way for plaintiff "to make known its views on matters of public importance" with nonfederal funds, imposing unconstitutional condition).

In other words, the coercive nature of the DEI Statement policy makes it more than a typical viewpoint discrimination claim. Rather, this claim is about the way that the University is leveraging the job opportunity to obtain affirmations of belief that

"by [their] nature cannot be confined within the scope of the [] program." *AOSI*, 570 U.S. at 221.

Defendants' arguments do not address these issues. Instead, they argue three points. First, they assert that Dr. Haltigan has not been compelled because he has not applied—but as explained in the standing argument, Dr. Haltigan's preemptive claim is intended to head off an imminent injury in the application process. Dr. Haltigan alleges that he would be compelled if he did apply. *See* SAC ¶¶ 99−106. This is sufficient to warrant prospective relief. Next, Defendants argue that there is no compulsion because Dr. Haltigan is free to write whatever he wants for his DEI Statement—but this is the same as saying that there can never be an unconstitutional condition because the individual can always refuse the benefit. The same was true of the plaintiff in *AOSI*. The plaintiff in that case could have just agreed to pledge itself to the government's views on prostitution, but this is not the law. The Supreme Court has repeatedly stated that conditions which "seek to leverage funding to regulate speech outside the contours of the program" are unconstitutional, notwithstanding whether there is an entitlement or an ability to refuse the benefit. *See AOSI*, 570 U.S. at 214−15. And finally, the University argues that there can be no problem with compelled speech because the DEI Statement bears on the applicant's "official duties." MTD at 25. This last objection simply begs the question; the issue presented by this claim is whether the DEI Statement policy is "within the scope of the program." *AOSI*, 570 U.S. at 218−19. Dr. Haltigan alleges that it is outside any reasonable understanding of the scope of an academic position to force applicants to express their belief with contested ideological premises on race, gender, and ethnicity. SAC ¶¶ 102−104. The University does not meaningfully respond to this point.

## CONCLUSION

The Defendants' Motion to Dismiss should be DENIED.

DATED:  March 29, 2024.

Respectfully submitted,

JOSHUA P. THOMPSON
WILSON C. FREEMAN*
JACK E. BROWN*

By ___/s/ Wilson C. Freeman_____
        WILSON C. FREEMAN*

*Attorneys for Plaintiff*

*pro hac vice*

1

# CERTIFICATE OF SERVICE

2     I hereby certify that on March 29, 2024, Opposing Counsel received the

3 foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION

4 TO DISMISS SECOND AMENDED COMPLAINT via CM/ECF service.

5                                          By   /s/ Wilson C. Freeman
                                                 WILSON C. FREEMAN*
6
                                          *Attorney for Plaintiff*
7
                                          *pro hac vice*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28